866 F.2d 1099
 35 Cont.Cas.Fed. (CCH) 75,617
 SIERRA PACIFIC INDUSTRIES, a California corporation; Pine
Mountain Lumber Co., a California corporation; George A.
Schmidbauer; Mary M. Schmidbauer; Schmidbauer Lumber,
Inc., a California corporation, Plaintiffs-Cross Appellees,
and
Eel River Sawmills, Inc., a California corporation;
Erickson Lumber Co., a California corporation; Hi-Ridge
Lumber Co., a California corporation; P & M Cedar Products,
Inc., a California corporation, Plaintiffs-Appellants-Cross Appellees,
v.
Richard LYNG,* Secretary of the United States
Department of Agriculture; R. Max Peterson, Chief of the
United States Forest Service; Zane G. Smith, Jr., Regional
Forester for Region 5 of the United States Forest Service,
Defendants-Appellees-Cross Appellants.
BIG FLAT TIMBER CO., a California general partnership;
Suntip Co., an Oregon general partnership; Hampton Tree
Farms, Inc., an Oregon corporation; Roseburg Lumber Co., an
Oregon corporation; Publishers Paper Co., a Delaware
corporation; Penn Timber, Inc., an Oregon corporation;
Merrill & Ring, Inc., a Washington corporation; Wilsonville
Timber Co., Ltd., an Oregon partnership, Plaintiffs-Cross Appellees,
and
Willamette Industries, Inc., an Oregon corporation,
Plaintiff-Appellant- Cross Appellee,
and
Pedee Lumber Co., an Oregon corporation; Alpine Veneers,
Inc., an Oregon corporation, Plaintiffs-Intervenors,
v.
Richard LYNG, Secretary of the United States Department of
Agriculture; R. Max Peterson, Chief of the United States
Forest Service; James F. Torrence, Regional Forester for
Region 6 of the United States Forest Service,
Defendants-Appellees-Cross Appellants.
 Nos. 86-2708, 86-2718, 86-2994, 86-15012, 87-3799 and 87-3835.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 14, 1988.
Decided Jan. 25, 1989.
 
 Wesley R. Higbie, Hendrickson, Higbie & Cole, San Francisco, Cal., for plaintiffs-appellants-cross appellees Eel River Sawmills, Inc., et al.
 James N. Westwood, Miller Nash, Wiener, Hager & Carlsen, Portland, Or., for plaintiff-appellant-cross appellee Willamette Industries, Inc.
 Dirk D. Snel, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants-appellees-cross appellants.
 James H. Clarke, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, Or., for plaintiff-cross appellee Publishers Paper Co.
 Mildred J. Carmack, Schwabe, Williamson & Wyatt, Portland, Or., for plaintiffs-cross appellees Penn Timber, Inc., et al.
 Appeal from the United States District Court for the Northern District of California.
 Appeal from the United States District Court for the District of Oregon.
 Before GOODWIN, SCHROEDER and POOLE, Circuit Judges.
 POOLE, Circuit Judge:
 
 
 1
 Plaintiffs, logging and timber firms, brought separate actions in California and Oregon against defendants, the Secretary of Agriculture and U.S. Forest Service officials, challenging the validity of regulations issued to implement Sec. 2 of the Federal Timber Contract Payment Modification Act, 16 U.S.C. Sec. 618 (Supp. IV 1986) ("the Act"). The Act allows holders of certain federal timber contracts to be released from their contractual obligations upon payment of a "buy-out" charge. The plaintiffs appeal those portions of the district courts' orders sustaining three of the regulations, and the government appeals those portions which hold that the effective date of the release must be adjusted to reflect the Secretary's delay in implementing the regulations. We affirm in part, reverse in part and remand for further proceedings.
 
 BACKGROUND[1]
 
 2
 The National Forest System is administered by the Secretary of Agriculture through the United States Forest Service. Pursuant to 16 U.S.C. Sec. 472a (1982), the Forest Service sells to private companies the rights to cut and sell timber grown on National Forest System lands.[2] For each designated tract, the Forest Service estimates the volume of merchantable timber and the appraised value so that prospective purchasers can prepare bids. A timber sale contract is awarded to the highest qualified bidder.
 
 
 3
 Each timber sale contract obligates the purchaser to cut and remove all included timber from the designated tract within a certain period, usually three to five years. Under these contracts, actual payment is not based on the estimated volume; rather, the purchaser pays the contract rate multiplied by the actual volume of merchantable timber removed. In the event of failure to perform, the purchaser is obligated to pay damages to the U.S. in the amount of the difference between the contract price and the price at which the timber can be resold.
 
 
 4
 Between 1977 and 1980, a combination of economic factors caused many timber companies to bid for timber at three to four times the Forest Service appraised value. In the early 1980's, however, the market for forest products declined substantially, leaving timber companies with contract obligations far above the market value of the timber. Strict enforcement of contract deadlines threatened to force many timber companies out of business, devastating communities which were dependent on the forest products industry.
 
 
 5
 The Forest Service responded to this economic situation by authorizing extraordinary extensions of time for contract performance, based on a finding of substantial overriding public interest pursuant to 16 U.S.C. Sec. 472a(c)(B). The extension policies announced in May 1980 and October 1981 became known as "Soft I" and "Soft II" respectively. A third extension policy was announced in November 1982. At first, these extension policies required the timber companies to make interim monthly payments (extension deposits) during the term of the extension. In 1982, however, the government authorized deferral of extension deposits until just before harvesting, provided that the purchaser paid interest for the deferral period.
 
 
 6
 In July 1983, the President authorized the Secretary of Agriculture to extend certain timber sale contracts for up to five years without requiring the purchaser to pay interest. This policy was known as the Multi-Sale Extension Program (MSEP). In order to qualify, a purchaser had to agree to modify his contracts to include certain conditions. The major requirement was that the purchaser establish a harvest schedule reflecting proportionate harvesting of all timber remaining in the extended contracts.[3]
 
 
 7
 In 1984, Congress passed the Federal Timber Contract Payment Modification Act, and it was signed by the President on October 16, 1984. Pub.L. 98-478, 98 Stat. 2213 (1984). The Act ratified the MSEP (with one modification not relevant here) as implemented by the Secretary of Agriculture. 16 U.S.C. Sec. 618(b). The Act also authorized and directed the Secretaries of Agriculture and Interior to permit purchasers to return a certain number of timber contracts upon payment of a "buy-out" charge. 16 U.S.C. Sec. 618(a).
 
 
 8
 Under Sec. 2(a)(6)(A) of the Act, the Secretaries were directed to publish final rules for the implementation of the Act within 90 days after enactment. 16 U.S.C. Sec. 618(a)(6)(A). On January 4, 1985, the Forest Service published for comment its proposed rules, along with proposed modifications to the MSEP to accommodate the effects of the Act. Final rules for implementing the Act were not published until June 27, 1985; final rules modifying the MSEP were published on August 7, 1985.
 
 PROCEEDINGS BELOW
 
 9
 In August 1985, ten plaintiffs sued the Secretary of Agriculture and Forest Service officials in the District of Oregon, challenging the validity of seven of the final buy-out regulations. In September 1985, nine different plaintiffs filed a substantially identical complaint in the Northern District of California, challenging six of the final regulations.
 
 
 10
 On August 8, 1986, the district court in California (Judge Samuel Conti, presiding) issued its opinion on the parties' cross motions for summary judgment. Sierra Pacific Industries v. Block, 643 F.Supp. 1256 (N.D.Cal.1986). The court upheld substantially all of the regulations,[4] but it also held that the Secretary's delay in promulgating the regulations required that the effective release date of each contract be adjusted by the length of the delay. The Secretary appeals the latter ruling, and four of the plaintiffs ("the California appellants") appeal the grant of summary judgment as to three of the regulations.
 
 
 11
 On February 2, 1987, the district court of Oregon (Judge Helen Frye, presiding), relying in part on the decision in the California litigation, issued an unpublished opinion. The Oregon decision followed the California ruling on the implementation delay. Judge Frye also granted summary judgment for the plaintiffs as to one of the regulations, holding that the government had failed to give adequate notice in promulgating the regulation. Summary judgment was granted for the defendants on the remaining claims. The Secretary appeals the ruling regarding the implementation delay, and plaintiff Willamette Industries appeals the grant of summary judgment as to its first claim.STANDARD OF REVIEW
 
 
 12
 The district court's grant of summary judgment is reviewed de novo. Zarr v. Barlow, 800 F.2d 1484, 1486 (9th Cir.1986). The regulations at issue are final rules promulgated under Sec. 2(a)(6)(A) of the Act; consequently, they are subject to judicial review in accordance with the Administrative Procedure Act, 5 U.S.C. Secs. 701 et seq. (1982) ("the APA"). The APA provides that final agency action shall be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if it was taken "without observance of procedure required by law." 5 U.S.C. Sec. 706(2)(A) & (D).
 
 
 13
 Review under the "arbitrary and capricious" standard is narrow, and a court may not substitute its judgment for that of the agency. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Nonetheless, the agency must articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." Id. In reviewing that explanation, a court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id.; Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).
 
 
 14
 Where review involves an agency's construction of the statute it administers, the court must first give effect to the unambiguously expressed intent of Congress. Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If the statute is silent or ambiguous with respect to the specific issue, then the court is limited to considering whether the agency's interpretation is based on a permissible construction of the statute. Id. at 843, 104 S.Ct. at 2782.
 
 DISCUSSION
 1. Revision of Existing Harvest Schedules
 
 15
 Two of the challenged regulations, 36 C.F.R. Sec. 223.171(a)(6) (1987) and 36 C.F.R. Sec. 223.177(g) (1987), provide that a purchaser who returns a contract that is included in an approved harvest schedule under the MSEP must revise that harvest schedule to delete the bought-out contracts and provide for proportionate harvesting of the remaining volumes. At issue is whether these regulations are consistent with Sec. 2(b)(1) of the Act, which provides in relevant part:
 
 
 16
 [T]he President's program of July 28, 1983 [the MSEP], as implemented by the Secretary of Agriculture and the Secretary of the Interior, providing for the extension of certain timber sale contracts and requiring the phased harvesting of such extended contracts.... is hereby ratified ...
 
 
 17
 16 U.S.C. Sec. 618(b)(1).
 
 
 18
 Willamette's[5] argument that the regulations are arbitrary and capricious focuses on Congress' ratification of the MSEP "as implemented." Willamette asserts that prior to the enactment of the Act, the Forest Service did not require purchasers to revise existing harvest schedules when contracts were cancelled or transferred to third parties. Instead, the Forest Service treated such contracts as harvested according to schedule.[6] Willamette contends that this policy was part of the MSEP at the time it was ratified, and that Congress intended that the MSEP should not be changed except as provided in the Act. "[T]he Secretary of Agriculture is not to impose on extended contracts any contract provision which was not being used in the timber sale program as of June 1, 1984." S.Rep. No. 596, 98th Cong., 2d Sess. 13, reprinted in 1984 U.S.Code Cong. & Ad.News 3796, 3806.[7]
 
 
 19
 In response, the Secretary argues that proportionate harvesting is and always has been a keystone of the MSEP, and that adjustment is necessary after buy-out to further the stated goals of the MSEP: "One of the major objectives of the Multi-Sale Extension Plan policy is the steady harvest of National Forest timber under contract." 48 Fed.Reg. 54812, 54814 (Dec. 7, 1983). In particular, the Secretary is concerned about a practice known as "front-end loading," in which a purchaser shifts his most expensive contracts to the early years of his harvest plan and then buys them out, leaving his least expensive contracts bunched up during the later years of the plan. The purchaser is then free to fill up his now-vacant early years with new contracts at current prices, which are even less expensive than the remaining extended contracts.[8]
 
 
 20
 Looking first to the plain language of the statute, we cannot say that Congress has directly addressed this issue. Although it is clear that Congress intended that proportionate harvesting would be retained, it is not clear whether Congress intended to require revision of harvest schedules after the bought-out contracts were returned. The legislative history cited by Willamette is inconclusive; proportionate harvesting was unquestionably a "contract provision ... being used in the timber sale program as of June 1, 1984."
 
 
 21
 Since Congress did not address the issue, we should defer to the Secretary's interpretation of the Act if it is based on a permissible construction of the statute. Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. We believe the Secretary's interpretation is permissible. The major objective of the MSEP was the "blend down" concept, meaning that purchasers were given adequate time to mix newer, less expensive timber sales with their higher-priced timber. Proportionate harvesting was required so that purchasers would blend new and old contracts instead of deferring disproportionate volumes of the older contracts to later years.[9] The requirement that harvest schedules be revised after buy-out serves the same objective by requiring that the remaining expensive contracts be spread proportionately among the remaining years of the plan. "Phased [i.e., proportionate] harvesting" is thus preserved.
 
 
 22
 Willamette argues that revision of existing schedules defeats the purpose of the Act, which, in its words, is "to permit purchasers to return their onerous contracts to the government and replace them with contracts that are now available at a significantly lower price." However, Willamette may return its most expensive contracts whether or not it is required to revise its harvest schedule; the regulations only require that Willamette blend its remaining contracts with new ones instead of leaving a disproportionate number of them to later years.[10] This is perfectly consistent with both the blend-down objective of the MSEP and the buy-out policy of the Act.
 
 
 23
 Finally, Willamette argues that even if the regulations are consistent with the Act, they must be struck down as arbitrary and capricious because the Forest Service did not explain why it chose to treat bought-out contracts differently from contracts cancelled for other reasons. We reject this argument. Because the purchaser has control over which contracts are bought out, it is manifest that such contracts are qualitatively different from contracts which are cancelled by legislative or administrative direction or transferred with Forest Service approval. We believe it was within the Secretary's discretion to require that "deletion of a bought-out sale from the multi-sale extension plan accurately reflect[ ] the contract buy-out action." 50 Fed.Reg. 31840, 31841 (Aug. 7, 1985); see 643 F.Supp. at 1280-81.
 
 
 24
 Accordingly, we affirm the partial judgments below upholding the validity of 36 C.F.R. Sec. 223.171(a)(6) and 36 C.F.R. Sec. 223.177(g).
 
 
 25
 2. Method of Calculating Timber Volume Subject to Buy-Out
 
 
 26
 The Secretary's regulations provide that the buy-out charge shall be calculated on the basis of the "remaining net merchantable sawtimber volume." 36 C.F.R. Sec. 223.177(f) (1987). The method used by the Forest Service to determine "remaining net merchantable sawtimber volume" is set forth in 36 C.F.R. Sec. 223.175 (1987). If less than one-half of the advertised volume (known as the "A2 volume") has been removed, then the remaining volume is calculated by subtracting the actual volume removed from the advertised volume. Sec. 223.175(b). If more than one-half of the advertised volume has been removed, then the contracting officer estimates the remaining volume, and if the purchaser disagrees with the estimate, it may (at its own expense) have a qualified third party make an independent estimate. Sec. 223.175(c).[11]
 
 
 27
 The California appellants contend that Sec. 223.175 is inconsistent with Sec. 2(a)(3) of the Act, which defines the buy-out charge "per one thousand board feet of currently held volume." 16 U.S.C. Sec. 618(a)(3) (emphasis added). This argument is without merit. The legislative history cited by both parties and the trial court clearly demonstrates that Congress contemplated that advertised volumes would be used in calculating the buy-out charge:
 
 
 28
 The volume currently remaining in the contract is the volume to be charged against the purchaser's buy-out entitlement and on which he pays the buy-out cost. The volume currently remaining in the contract normally is the volume estimated and stated by the agency when the contract originally was sold, less any volume cut, removed and paid for.
 
 
 29
 S.Rep. No. 596, 98th Cong., 2d Sess. 10, reprinted in 1984 U.S.Code Cong. & Admin.News at 3803 (emphasis added); see also 643 F.Supp. at 1286.
 
 
 30
 Next, the California appellants contend that Sec. 223.175 is arbitrary and capricious because if the advertised volume is greater than the actual volume of timber in the cutting unit, then a portion of the purchaser's buy-out charge will represent nonexistent timber. We reject this argument. There is no way of determining the actual volume of timber remaining unless and until it is actually harvested. Plaintiffs are simply attempting to replace one method of estimation (original advertised volume less actual volume removed) with another (an independent "cruise"). An independent "cruise" is a costly and time-consuming procedure, and the Secretary reasonably determined that it ought not to be utilized unless there was a good chance that the new estimate would produce a significantly different result than would obtain using the advertised volume. Based on his discretion and expertise, the Secretary determined that "[u]sually it is difficult to accurately estimate whether a sale includes more or less timber than originally advertised unless the estimate is based on at least the harvest of half of the sale volume." 50 Fed.Reg. 26660, 26664 (June 27, 1984). Plaintiffs contend that there is no factual basis for this determination; however, the record contains an expert declaration which explains why a substantial variance in a small part of a sale is not necessarily indicative of a substantial variance in the sale as a whole.[12] Thus, the Secretary's explanation is supported by the record and bears a rational relation to the regulation restricting the use of independent estimates.
 
 
 31
 Finally, appellants complain that the regulation is arbitrary and capricious because the Forest Service inflexibly applies the rule without regard to whether a mistake was made in the advertised volume. As an example of this alleged rigidity, plaintiffs cite a letter from a contracting officer to Eel River Sawmills admitting that "an error was made in the computation of the sale volume," but stating that "[a] method for volume adjustment ... is not provided under the rules for buy-out." However, defendants point out that there is a provision for contract modification, and that Sec. 223.175(b) specifically provides that the Service will honor any contract modifications made to the advertised volume. See 36 C.F.R. Sec. 223.112 (1987) (permitting modification); Forest Service Timber Sale Administration Handbook, Sec. 33.1 (1986) ("The Forest Service ... recommend[s] timber sale contract modifications when necessary to clarify or to correct injustices to either the purchaser or the Forest Service."). The letter to Eel River Sawmills notes that Eel River was aware of the under-run prior to bidding and states: "This indicates that a mutual mistake, which might otherwise have justified a volume revision, did not exist." (emphasis added). Thus, the rules are not so inflexible as to render them arbitrary and capricious.
 
 
 32
 We therefore affirm the judgments upholding the validity of 36 C.F.R. Sec. 223.175.[13]
 
 
 33
 3. Requirement That Claims Against Government Be Waived
 
 
 34
 36 C.F.R. Sec. 223.178(b)(4) (1987) provides that a purchaser must release the Government from all claims arising from the returned contract as a condition of buy-out.
 
 
 35
 In the California litigation, Judge Conti sustained the regulation against a substantive challenge, and the California appellants appealed. Subsequently, plaintiffs in the Oregon litigation challenged the regulation on the ground that it had been promulgated without sufficient notice. Judge Frye held that the proposed rules did not "fairly apprise interested persons of the subjects and issues the agency was considering" with respect to the waiver requirement. Opinion and Order at 19, citing American Transfer & Storage Co. v. ICC, 719 F.2d 1283, 1303 (5th Cir.1983). She therefore invalidated the rule on this ground. The Secretary chose not to appeal this ruling; instead, he republished the regulation in the Federal Register and requested comments. 52 Fed.Reg. 22348-50 (June 11, 1987). Following the comment period, the regulation was "repromulgated" without change. 53 Fed.Reg. 15035-39 (April 27, 1988).
 
 
 36
 Assuming arguendo that the regulation as initially promulgated was procedurally invalid (which the Secretary may well be deemed to have conceded by failing to argue the point), we have serious doubt whether the "repromulgated" rule could be applied retroactively to the appellants, who submitted their buy-out applications more than two years prior to the readoption of the rule.[14] However, we do not need to decide this difficult procedural question, because we are of the opinion that the challenged regulation must be invalidated in any case as arbitrary and capricious.
 
 
 37
 We begin our analysis with Sec. 2(a)(1) of the Act, which, in providing for the release of the purchaser's obligation to cut, remove and pay for timber, contains the following proviso:
 
 
 38
 The Government does not hereby surrender any other claim against a purchaser which arose under a contract prior to effectuation of this release and not in connection with this release from obligation to cut, harvest and pay for timber.
 
 
 39
 16 U.S.C. Sec. 618(a)(1). Appellants argue that because this section does not mention any change to be made to the rights of purchasers to pursue contract claims against the government, Congress must have intended that no change be made. Conversely, the Secretary argues that because this section reserves only the rights of the government, Congress must have intended that no other claims would survive. The Secretary concedes that "there is no direct language in the statute mandating a purchaser to waive claims as a prerequisite to the Government accepting a returned contract;" nonetheless, the Secretary argues that the claims waiver is "implicit" in the statute. 53 Fed.Reg. 15035, 15036. We cannot agree. In context, the language of the statute serves only to limit the scope of the release granted by the government. The absence of any reference to the purchaser's claims, along with the absence of any reference in the legislative history, only makes it clear that Congress has not spoken with respect to the specific issue. Thus, under Chevron, we must determine whether the regulation is based on a permissible construction of the statute.
 
 
 40
 We do not believe that the Secretary's construction is permissible. The sole asserted basis for the claims waiver provision is Sec. 2(a)(5)(A) of the Act, which provides that returned timber "shall be given preference for resale." 16 U.S.C. Sec. 618(a)(5)(A). From this, the government argues that "[p]reserving a purchaser's claims against the government would seem inconsistent with the statutory goal of prompt resale. Such resale could ... be delayed if bought-out timber became the subject of litigation of prior purchaser claims." Opposition Brief at 31. However, this rationale overlooks the fact that the government's pre-existing claims against timber purchasers, which the statute explicitly preserves, could also result in future litigation. Thus, it is clear that the statutory "preference" for resale of returned timber is not so inflexible as to foreclose any necessary delay that settlement of pre-existing claims might entail. In the words of the Act's sponsor, Senator Hatfield, "[t]his preference for reoffering of returned and defaulted sales is not ... an absolute mandate;" rather, it was intended to apply only "where other factors are similar." Additional Remarks of Sen. Hatfield, S.Rep. No. 596, 98th Cong., 2d Sess. 22-23, reprinted in 1984 U.S.Code Cong. & Admin.News at 3815. The existence of a prior claim arising out of the returned contract, whether raised by the government or by the purchaser, is certainly a factor which the Secretary could legitimately consider in determining when a particular contract should be offered for resale. Thus, there is no basis for the Secretary's assertion that the preservation of a purchaser's pre-existing claims is "inconsistent" with the statutory goal.
 
 
 41
 Appellants also argue that the Secretary's regulation violates the "well-established principle of statutory construction that '[t]he common law ... ought not to be deemed to be repealed unless the language of a statute be clear and explicit for this purpose.' " Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co., 464 U.S. 30, 35, 104 S.Ct. 304, 307, 78 L.Ed.2d 29 (1983), quoting Fairfax's Devisee v. Hunter's Lessee, 11 U.S. (7 Cranch) 603, 611, 3 L.Ed. 453 (1813). At common law, the right to sue for damages based on a breach which occurred prior to the termination of the contract was not discharged by the termination.[15] See, e.g., 5A Corbin on Contracts, Sec. 1229 (1964); see also U.C.C. Sec. 2-106(3).[16] Therefore, appellants argue, the regulation can be sustained only if the statute explicitly provides that their claims must be waived.
 
 
 42
 While we doubt that this principle alone would be sufficient to invalidate a reasonable administrative construction of the statute, we agree with appellants that, in the absence of any statutory policy on which the claims waiver provision may be based, the principle is persuasive here. Accordingly, we hold that 36 C.F.R. Sec. 223.175(b)(4) is arbitrary and capricious, and we reverse those portions of the district courts' orders sustaining the regulation.[17]
 
 4. Effect of Secretary's Delay
 
 43
 Sec. 2(a)(6)(A) of the Act provides that the Secretary "shall" publish final rules for the implementation of the Act "within ninety days after October 16, 1984." 16 U.S.C. Sec. 618(a)(6)(A). The Secretary did not publish final rules until June 27, 1985, 164 days after the statutory deadline.[18] In order to compensate for the effect of this delay, Judge Conti ordered each plaintiff released from its contractual obligations as of 163 days prior to the date the application was received.[19] Judge Frye adopted Judge Conti's ruling on this issue. Opinion and Order at 13-14.
 
 
 44
 The Secretary appeals these rulings, contending that unless the statute provided a specific consequence for failure to act by the deadline, the district court was without power to impose a judicial sanction for the Secretary's delay. Alternatively, the Secretary argues that the district court abused its discretion in ordering the relief granted. We address each of these contentions in turn.
 
 A. Authority to Order Equitable Relief
 
 45
 Our inquiry into the district court's authority to order equitable relief begins with the well-established principle that "while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." Ford Motor Co. v. NLRB, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939); see also Hondros v. U.S. Civil Service Comm'n, 720 F.2d 278, 298 (3rd Cir.1983) (APA "is a source of injunctive relief to remedy an arbitrary or capricious delay or denial of agency action"; court ordered plaintiff appointed to permanent position where agency arbitrarily delayed certification); Jacksonville Port Authority v. Adams, 556 F.2d 52, 56 (D.C.Cir.1977) ("appellate court may, in the interest of equity and justice, make the plaintiff whole by ordering the FAA and the district court to act as if there had been a conditional grant prior to June 30, 1975" (emphasis added); court ordered FAA to grant entitlement despite passage of congressional deadline).
 
 
 46
 The Secretary attempts to defeat the inherent equitable powers recognized in these cases by relying on the following statement from Marshall v. Local Union 1374, Int'l Ass'n of Machinists, 558 F.2d 1354 (9th Cir.1977):
 
 
 47
 A statutory time limit is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provision.
 
 
 48
 Id. at 1357, quoting Fort Worth Nat'l Corp. v. Federal Savings and Loan Ins. Corp., 469 F.2d 47, 58 (5th Cir.1972). Although Marshall was later held by this court to have been overruled by a subsequent Supreme Court decision, see City of Edmonds v. United States Dep't of Labor, 749 F.2d 1419, 1422-23 (9th Cir.1984), the Secretary argues that the rationale and result of Edmonds was disapproved by the Supreme Court in Brock v. Pierce County, 476 U.S. 253, 258-62 & n. 6, 106 S.Ct. 1834, 1838-40 & n. 6, 90 L.Ed.2d 248 (1986), thereby restoring Marshall to the status of valid precedent.
 
 
 49
 The Secretary's reliance on Marshall is misplaced. Assuming arguendo that Marshall and the Fort Worth doctrine are the law of this circuit, those cases do not hold that a court cannot order any equitable relief to compensate for an official's failure to act. As explained by the Supreme Court in Brock, the Fort Worth line of cases holds that "[g]overnment agencies do not lose jurisdiction for failure to comply with statutory time limits." 476 U.S. at 259, 106 S.Ct. at 1838 (emphasis added). The Supreme Court in Brock specifically contemplated that other remedies were available to the court: "When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." Id. at 260, 106 S.Ct. at 1839 (emphasis added; footnote omitted). This conclusion is also recognized in Marshall itself, where the court stated that although the statutory time limit was not "jurisdictional," the court "should consider the rights of all parties affected ... in order to evaluate what action will best serve the purposes of the statute." 558 F.2d at 1357-58. Thus, Marshall does not compel the conclusion that the district court was powerless to order an equitable adjustment in this case.[20]
 
 
 50
 Next, the Secretary argues that the relief ordered by the district court is contrary to Sec. 2(a)(1) of the Act, which provides for release upon payment of the buy-out charge and completion of the obligation to harvest to logical stopping points. We disagree. It was the Secretary's own regulations which provided that a purchaser's contract obligations should be held in abeyance during the period between receipt of an application and actual payment following the Secretary's approval of the application. The Secretary cannot now argue that this extra abatement period is contrary to the Act. As for the power of the district courts to order equitable relief under the Act, we find nothing in the statute to indicate that Congress intended to divest the courts of their inherent equitable powers. We recognize that the thrust of Brock and Marshall is that "shall" is not always mandatory unless Congress has specified a consequence. However, as noted above, Brock and Marshall rely heavily on the fact that depriving the agency of its power to act was a remedy which would thwart the statutory purpose. Here, by contrast, enforcing the deadline would serve the statutory purpose of providing immediate relief for timber purchasers. See Mohasco Corp. v. Silver, 447 U.S. 807, 825, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980) ("By choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all [claims]") (refusing to construe statute to extend limitations period). Indeed, the Secretary concedes that plaintiffs could have brought an action under the APA to compel the Forest Service to act. See Brock, 476 U.S. at 260 n. 7, 106 S.Ct. at 1839 n. 7. We therefore reject the Secretary's argument. We hold that the district courts had authority to order an equitable adjustment to the release date under the Act.
 
 B. Abuse of Discretion
 
 51
 In arguing that the district court abused its discretion in granting the equitable relief described above, the Secretary presents three arguments. First, he urges that Brock admonishes courts that an agency's delay should not "prejudice the rights of the taxpaying public," 476 U.S. at 261, 106 S.Ct. at 1839, or otherwise harm the public fisc. Id. at 262, 106 S.Ct. at 1840. However, the plaintiffs correctly point out that, unlike Brock, this case does not involve any limitation on the Secretary's enforcement of a public right. Abating contract obligations that continued to accrue during the Secretary's delay does not deprive the government of anything that it would have been entitled to receive had the statutory deadline been met. We therefore reject the Secretary's first argument.
 
 
 52
 Second, the Secretary argues that the relief ordered improperly assumes that plaintiffs would have submitted their buy-out applications the day after the regulations were issued. This contention is without merit. Because the release dates are calculated by subtracting 164 days from the actual date each application was received, the actual time consumed by each plaintiff in preparing its applications is accounted for.
 
 
 53
 Finally, the Secretary contends that the district court failed to consider whether the plaintiffs obtained any countervailing benefit from the Secretary's delay. See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 107 S.Ct. 1396, 1403, 94 L.Ed.2d 542 (1987) (unless Congress has specifically limited the court's discretion, "a court must balance the competing claims of injury and must consider the effect on each party" before granting a preliminary injunction); Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (same). However, the Secretary did not raise this argument in the California litigation until December 23, 1986, after the district court had first entered its amended judgment and the Secretary had filed his second (and final) notice of appeal. Thus, we must consider whether this issue is properly before the court. To answer this question, it is necessary to recount the post-judgment chronology of the California litigation in detail.
 
 
 54
 Judge Conti's original judgment was entered on August 8, 1986. On September 11, the Secretary noticed a motion under Fed.R.Civ.P. 60 to correct the computational error in the number of days of delay. On September 29, the Secretary amended the Rule 60 motion to add its argument based on Brock v. Pierce County. As this motion did not toll the time in which to file an appeal, see Browder v. Director, Dep't of Corrections, 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 560 n. 7, 54 L.Ed.2d 521 (1978), the Secretary filed a notice of appeal from the original judgment on October 2. The filing of the notice of appeal divested the district court of jurisdiction to rule on the Rule 60(b) motion. Scott v. Younger, 739 F.2d 1464, 1466 (9th Cir.1984).[21] Nonetheless, Judge Conti entered his order and amended judgment on November 21, and the government noticed its appeal from this judgment on November 28.
 
 
 55
 On December 23, the Secretary noticed another motion under Rule 60(b) for relief from judgment, and asked the district court for an order indicating that it would entertain the motion. It was at this time that the Secretary first raised the argument that plaintiffs had received countervailing benefits from the Secretary's delay. The motion was supported by an affidavit from Raymond G. Weinmann, Assistant Regional Forester for Region 5, purporting to show that all of the California plaintiffs except one had benefitted from the delay.
 
 
 56
 In the meantime, plaintiffs moved in this court for an order of limited remand to permit entry of the amended judgment of November 21. The Secretary responded with a request that the limited remand should also allow the district court to rule on its December 23 motion. On January 29, 1987, this court entered an order denying the motion without prejudice to renewal if the district court indicated it was willing to entertain the government's motion. The order stated that plaintiffs could renew their motion if the district court declined to consider the government's motion.
 
 
 57
 Judge Conti responded on February 5 by re-entering his November 21 order verbatim, with the date changed to February 5. This order was also ineffective, as this court still had jurisdiction over the case and had not granted the order of limited remand.
 
 
 58
 On February 13, plaintiffs returned to this court to renew their motion for limited remand. In their motion, plaintiffs stated that they construed Judge Conti's February 5 order as an indication that he declined to consider the Secretary's December 23 motion. This court granted plaintiffs motion for limited remand without comment on February 24. In accordance with this order, Judge Conti re-entered his order and amended judgment on May 8, 1987.
 
 
 59
 In the meantime, the Secretary had raised the countervailing benefit argument in the Oregon district court in his November 19, 1986 response to plaintiffs' motion for summary judgment. Judge Frye did not separately address this issue in her February 2, 1987 order granting summary judgment; instead, she adopted the analysis and conclusion of Judge Conti's November 21 order. However, as the above chronology shows, the Secretary had not yet raised the issue in the California litigation when the November 21 order was made.
 
 
 60
 Thus, from our examination of the record it does not appear that either district court considered the Secretary's argument on the merits. Judge Conti's orders of February 5 and May 8 did not purport to address the Secretary's December 23 motion. Even if they had, the district court was without jurisdiction to rule on the Rule 60(b) motion unless this court remanded the case to it for that purpose, and the limited remand ordered on February 24 was only for the purpose of entering the November 21 amended judgment. Judge Frye merely adopted without change Judge Conti's November 21 order, which did not address the issue.
 
 
 61
 In these unusual circumstances, we believe the interests of justice would be served by remanding this claim to the district courts for further consideration.[22] The factual record is insufficiently developed for us to determine whether the Secretary's argument is factually supported and, if so, whether it would affect the equities of the case. The parties should be given an opportunity to submit affidavits and argument on this issue, and the district courts should make a ruling in the first instance. The district courts' orders granting summary judgment on plaintiffs' third claim for relief are therefore remanded for further consideration. This panel will retain jurisdiction over any subsequent appeal.
 
 
 62
 AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 *
 Richard Lyng, the current Secretary of Agriculture, is substituted for former Secretary Block. See Fed.R.App.Pro. 43(c)(1)
 
 
 [1]
 Judge Conti's opinion in the California litigation, Sierra Pacific Indus. v. Block, 643 F.Supp. 1256 (N.D.Cal.1986), contains a very thorough discussion of the forest products industry, the various terms used therein, and the economic problems which led to the enactment of the Act. 643 F.Supp. at 1259-65. The following is a brief summary
 
 
 [2]
 Timber sales on other public lands are administered under a different statutory scheme by the Bureau of Land Management, under the supervision of the Secretary of the Interior. See 30 U.S.C. Sec. 601, et seq. (1982); 43 C.F.R. Sec. 5400.0-3, et seq. (1987)
 
 
 [3]
 Standard timber contracts allow the purchaser to harvest the trees at any time before the expiration of the contract. Proportionate harvesting requires the purchaser to harvest a minimum volume of timber in each harvest year
 
 
 [4]
 Judge Conti granted partial summary judgment for the plaintiffs on their First Claim, holding that the revision of existing harvest schedules could not require "logged ahead" volumes to be spread out over the entire term of the extension. 643 F.Supp. at 1281-82. The government does not challenge this ruling on appeal
 
 
 [5]
 The California appellants join Willamette in contesting these regulations
 
 
 [6]
 Specifically, the Forest Service's policy, as set forth in Forest Service Manual Interim Directive No. 99 (June 27, 1984) ("I.D. No. 99"), was to allow, but not require, revision of existing harvest schedules in the following circumstances:
 (1) Deletion of a sale as a result of wilderness legislation requiring cancellation of the sale, or the Forest Service cancels the sale pursuant to [the regulation governing] Termination for Convenience;
 (m) Deletion of a sale by cancellation for the following reasons:
 (i) Cancellation by Agreement
 (ii) Cancellation because of catastrophic damage
 (iii) Cancellation to prevent damage to the environment.
 I.D. No. 99, Sec. 2433.12a at 16 (citations omitted). In addition, revision was allowed, but not required, in the following circumstances, so long as there were "no changes in the scheduled harvest":
 (c) Addition or deletion of sales if the purchaser sells its entire business or merges with another firm....
 (d) Addition or deletion of sales as a result of third-party agreements.
 Id. at 14-16.
 
 
 [7]
 We note that it is not clear that the Forest Service's policy was being used as of June 1, 1984. I.D. No. 99 was issued on June 27, 1984, after the date specified in the Senate Report but before the Act was passed. Prior to I.D. No. 99, the only statement regarding revision of harvest schedules in the public record was in the final MSEP policy, which provided: "sales directly involved in mergers or Third-Party Agreements could be added to or deleted from the schedule, and the harvest schedule levels would have to be recalculated." 48 Fed.Reg. 54812, 54814 (Dec. 7, 1983) (emphasis added). However, the Secretary does not argue that the policy was not in effect prior to June 1, 1984, so we will assume for purposes of discussion that it was
 
 
 [8]
 In his opinion, Judge Conti made an exhaustive examination of the economics of proportionate harvesting and front-end loading, using a detailed numerical example. 643 F.Supp. at 1267-79. He demonstrated that although the total amount of timber and the total payment remains the same whether or not the harvest plan is revised, the purchaser is able to defer a higher percentage of his expensive contracts to later years if the plan is not revised
 
 
 [9]
 Willamette refers to excessive deferral as "rear-end loading," but it is not in fact the opposite of "front-end loading." Both practices result in disproportionate volumes of high-priced timber being deferred to later years. The difference is that "front-end loading" achieves this result by buying out volumes scheduled for harvest in early years, whereas "rear-end loading" achieves it by initially scheduling excessive volumes in later years
 
 
 [10]
 Furthermore, nothing prevents Willamette from harvesting its newest contracts ahead of schedule, thereby obtaining additional profits to offset against losses on its older contracts. The regulations only require that Willamette harvest a minimum portion of its older contracts in any given year
 
 
 [11]
 Although the method of estimation is not specified in the regulation, the parties agree that this provision contemplates a "cruise," or visual inspection, of the remaining timber. See 643 F.Supp. at 1260 (explaining how a "cruise" is performed)
 
 
 [12]
 This declaration is properly considered as an explanation of the agency's stated reason; it does not create a new rationalization which the agency itself had not given. See Association of Pacific Fisheries v. EPA, 615 F.2d 794, 811-12 (9th Cir.1980)
 
 
 [13]
 In their reply brief, plaintiffs claim that the Forest Service has "impliedly conceded" that Secs. 223.175(b) and (c) were promulgated without notice. This argument is wholly without merit. The single cryptic remark regarding notice in the plaintiffs' opening brief is so underdeveloped that nothing can be implied from the Forest Service's failure to reply. In any case, it is obvious that the notice of proposed rules was sufficient to apprise plaintiffs of the Service's intent to rely on advertised volume. See proposed rule Sec. 223.174(g), 50 Fed.Reg. 488, 493 (Jan. 4, 1985). The provision for an independent cruise for more-than-half-harvested sales was an exception implemented in response to the comments received
 
 
 [14]
 The notice of repromulgation itself asserts that "this rulemaking does not reopen the opportunity for purchasers to file buy-out applications." 53 Fed.Reg. 15035, 15038
 
 
 [15]
 We recognize that suits against the government are not suits "at common law" within the meaning of the Seventh Amendment. See, e.g., Glidden Co. v. Zdanok, 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671 (1962) (plurality opinion); McElrath v. United States, 102 U.S. 426, 439-40, 26 L.Ed. 189 (1880). However, the Supreme Court has also stated that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Lynch v. United States, 292 U.S. 571, 579-82, 54 S.Ct. 840, 843-44, 78 L.Ed. 1434 (1934); accord, Priebe & Sons v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947) ("[We] apply to the construction of government contracts the principles of general contract law."); Torncello v. United States, 681 F.2d 756, 762, 231 Ct.Cl. 20 (1982) (en banc) ("The government contracts as does a private person, under the broad dictates of the common law."). In Lynch, the Court distinguished the government's right to withdraw its consent to suit, a purely statutory remedy, from its power to abrogate its existing contract obligations, which was limited by the Fifth Amendment. 292 U.S. at 579-82, 54 S.Ct. at 843-45. Thus, even though the right to sue may not arise under the common law, it does not follow that the survival of claims which accrued prior to termination is not a "common law" right for purposes of statutory construction
 
 
 [16]
 Federal courts frequently draw upon the Uniform Commercial Code in creating federal common law. See, e.g., Gardiner Mfg. Co. v. United States, 479 F.2d 39, 41 (9th Cir.1973); United States v. Wegematic Corp., 360 F.2d 674, 676 (2nd Cir.1966); In re Humboldt Fir, Inc., 426 F.Supp. 292, 296-97 (N.D.Cal.1977), aff'd mem., 625 F.2d 330 (9th Cir.1980)
 
 
 [17]
 As we agree with appellants that the regulation is arbitrary and capricious, we do not need to address their further contention that the regulation works an improper taking in violation of the Fifth Amendment
 
 
 [18]
 90 days after October 16, 1984, is January 14, 1985. The district judge (and the parties) erroneously fixed the statutory deadline at January 15, 1985. This error led to the ultimate ruling that the effective date of release would have to be adjusted by 163 days. As we are remanding this claim, the district courts will have an opportunity to correct this error if such relief is still deemed appropriate
 
 
 [19]
 In his original order, Judge Conti mistakenly calculated the delay as 192 days, and he ordered the relief backdated from the date the buy-out charge was actually paid. 643 F.Supp. at 1283. The Secretary moved for relief from the judgment, pursuant to Fed.R.Civ.Pro. 60. In ruling on this motion, Judge Conti noted that the Secretary's own regulations provided for contract obligations to be abated as of the date the application was received. 36 C.F.R. Sec. 223.178(a) (1987). He therefore amended the judgment to change both the length of the delay and the date from which relief would be calculated. Order of Nov. 21, 1986. Pursuant to a limited remand from this court, the amended judgment was re-entered on May 8, 1987, in order to correct a jurisdictional defect. See discussion in Part 4.B., infra
 
 
 [20]
 The Secretary also argues that because the district court relied on City of Edmonds in granting relief, its decision must be overturned now that Edmonds has been disapproved by the Supreme Court. However, the court may affirm the district court on any basis fairly supported by the record. Beezley v. Fremont Mining Co., 804 F.2d 530, 530 n. 1 (9th Cir.1986), cert. denied, 480 U.S. 949, 107 S.Ct. 1610, 94 L.Ed.2d 796 (1987). Since Judge Conti reaffirmed his ruling after noting that Brock did not require a different result, his decision to grant relief on equitable grounds is not affected by the Supreme Court's disapproval of Edmonds
 
 
 [21]
 The proper procedure in such a situation is to ask the district court for an indication that it is willing to entertain a Rule 60(b) motion. If the district court gives such an indication, then the party should make a motion in the Court of Appeals for a limited remand to allow the district court to rule on the motion. Scott v. Younger, 739 F.2d at 1466
 
 
 [22]
 The California plaintiffs have made a motion to strike the Weinmann affidavit from the record. While we would ordinarily be inclined to grant such a motion where the issue was not properly raised in the district court, in this case it is clear that the Secretary made a good-faith, if unsuccessful, effort to comply with the procedure we have outlined for bringing a post-appeal Rule 60(b) motion. This court has sometimes construed a defective appeal involving a Rule 60(b) motion as a motion for a limited remand to allow the district court to address the motion. See Smith v. Lujan, 588 F.2d 1304, 1307 (9th Cir.1979); Crateo, Inc. v. Intermark, Inc., 536 F.2d 862, 869 (9th Cir.), cert. denied, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976). We believe a similar construction is appropriate here