**Rogelio ROMAN, et al., Plaintiffs,**

v.

**Gerald KORSON, et al., Defendants.**

**No. 1:91–CV–274.**

United States District Court,
W.D. Michigan,
Southern Division.

March 21, 2000.

Gary N. Gershon, Michigan Migrant Legal Assistance Project, Inc., Grand rapids, MI, Joseph V. Walker, Plunkett & Cooney, PC, Bloomfield Hills, MI, Fred Wagner, David M. Friedland, Stephen M. Arner, Beveridge & Diamond, PC, Washington, DC, Roger C. Rosenthal, Migrant Legal Action Program, Washington, DC, Lee Philip reno, Reno, Cavanaugh & Hornig, Washington, DC, for Rogelio Roman, Maria Roman, Ruben Roman, Robert Roman, Ramiro Roman, Jorge Luis Roman, David Peralez, Rosalinda Peralez, Ester Paredes, Raquel Roman, Maria Cruz, Asuncion Aparicio, Guadencio Aparicio, Jesus Mojica, Maria I. Espinoza, Ceferino Borja.

Ruth Ann Ernst, Asst. U.S. Atty., U.S. Attorney's Office, Western District of Michigan, Grand Rapids, MI, Anne L. Weismann, Eric Johnson Mahr, Rupa Bhattacharyya, U.S. Dept. of Justice, Civ. Div., Washington, DC, Richard G. Phillips, Jr., U.S. Dept. of Justice, Washington, DC, for Edward Madigan, Laverne Ausman, Calvin Lutz, Harry Brumer, Dept. of Agriculture, Farmers Home Admin.

## OPINION

ENSLEN, Chief Judge.

This matter is before the Court on Plaintiffs' Renewed Motion for Post-Judgment Relief (Dkt. No. 441). The Motion requests that the Court modify its Judgment and Permanent Injunction. The Motion implicates two legal questions: first, whether the modification of an Injunction intended to prevent a policy of non-enforcement of mandatory regulations requires a showing that the Federal Defendants have continued their policy of non-enforcement; and second, if the Injunction is modified, what kind of modifications are appropriate.

### A. Factual Background

This class action lawsuit was filed in 1991 to challenge the systematic failure of the Department of Agriculture and Farmer's Home Administration to enforce mandatory regulatory duties of the Section 514 loan program, authorized under 42 U.S.C. § 1484. (Farmer's Home Administration's was succeeded by Rural Housing Service and Rural Development. For ease of reference, the Federal agencies and their officers who are named as defendants have referred to themselves as the "Federal Defendants" to distinguish themselves from private defendants.[1]) The program at issue was designed to provide loans to borrowers to build housing for domestic farm labor. The mandatory regulations describing the program require that borrowers submit budgetary information demonstrating "the need and justification" of proposed rental and utility charges, obtain approval of rental and utility charges, bill tenants consistent with the approved rates, notify tenants of approved changes to rent and utility charges, and, in the event of unauthorized rental charges, rollback and rebate or credit the affected tenants. 7 C.F.R. § 1930, Subpart C, Exhibit C.

By Opinion and Order of November 30, 1993, the Court granted class action certification under Federal Rule of Civil Procedure 23. It then certified the class as:

All agricultural workers in the United States who reside, have resided or will reside in FmHA § 514 housing projects operating without loan agreements who have been or will be charged unauthorized rent and/or utilities.

*Roman v. Korson,* 152 F.R.D. 101 (W.D.Mich.1993).

By Order and Opinion of July 25, 1995, the Court considered the Plaintiffs and Federal Defendants' cross-motions for summary judgment as to Counts 1 and 2 and held that: (1) the Department of Agri-

---

1. The lawsuit originally included claims against private farmers, which were settled and resolved by Consent Judgment in 1995.

culture abdicated its regulatory responsibilities by failing to enforce labor housing regulations requiring borrowers to follow notice and comment procedures prior to increasing rents and to roll back and refund illegally charged rent, and (2) the Department of Agriculture acted arbitrarily and capriciously in enforcing labor housing regulations that allowed borrowers to be exempt from the loan agreement requirement and from the reporting requirement relating to charging of rent if borrowers stated that they would not charge rent. *Roman v. Korson,* 918 F.Supp. 1108 (W.D.Mich.1995). The Court then required further briefing as to the injunctive relief to be entered. *Id.*

After receiving multiple briefings from the parties, the Court entered its Judgment and Permanent Injunction against the Federal Defendants. The Court determined consistent with the decisions in *Bresgal v. Brock,* 843 F.2d 1163, 1171 (9th Cir.1987) and *Global Van Lines v. Interstate Commerce Commission,* 804 F.2d 1293, 1305 n. 95 (D.C.Cir.1986) that it was preferable to first allow the agency to correct its policy of non-enforcement before ordering specific remedies. Thus, the Court merely enjoined "Federal Defendants and their successors in office ... to CEASE in their failure to enforce the rollback and rebate or credit duty" and "to CEASE in their failure to enforce the notice and comment duty." (Judgment and Permanent Injunction of February 9, 1996, Dkt. No. 340.) The Court's Opinion of that date warned the Federal Defendants that the "Court does expect that the Federal Defendants will be vigilant in performing their regulatory duties. A failure

to take enforcement action in the future may warrant reconsideration of this decision and additional remedies." (Feb. 9, 1996 Opinion, Dkt. No. 339, at 4 & n. 2.)

In late 1998, after obtaining Freedom of Information Act documents, Plaintiffs moved to amend the Judgment because of suspected non-enforcement by the Federal Defendants. The Court denied the motion without prejudice by Order of March 18, 1999, while permitting Plaintiffs to obtain discovery on the issue of the Federal Defendants' post-judgment enforcement. (March 18, 1999 Order, Dkt. No. 411.) After said discovery, Plaintiffs renewed their motion for post-judgment relief by filing of December 17, 1999. The Renewed Motion has now been fully briefed and argument upon it is unnecessary.[2]

According to the Federal Defendants, they have taken at least four programmatic steps to enforce the Judgment and Permanent Injunction.[3] (Plaintiffs' Exhibit 3, Report of James Vollmer dated July 13, 1998.) According to James Vollmer, the Federal Defendants' "point-man" on Section 514 enforcement, these actions were:

1. Issued AN (Administrative Notice) on servicing on-farm labor housing accounts which imposed follow-up report; 2. Conducted an on-sight training session in Alabama; 3. Prepared summary report on status of follow-up actions to key National Office managers; and, 4. Prepared advice to Michigan state office staff in response to service a threat from an attorney....

(*Id.*)

James Vollmer summarized the results of the enforcement steps as follows:

2. Hearing is unnecessary to resolve factual disputes because the issues presented depend almost exclusively upon an examination of the administrative record (and related documents) and the law. While the Plaintiffs have asked for oral argument, due to the extensive briefing filed and the quality of the briefs submitted, the Court determines that oral argument is unnecessary and would unnecessarily delay adjudication.

3. In addition to the more important enforcement steps identified in the Report of James Vollmer, Vollmer also indicated that the Department gave other training sessions for field staff in Michigan and Vermont and provided other letters and oral contacts directed toward field staff. (*See* Vollmer Dep. at 104–107). There were also other specific enforcement measures taken after the Vollmer Report especially as to the key states of Vermont, Michigan, and Arkansas. (*See* Defendants' Exhibits 18, 28 & 30.)

1. The identified number of borrowers who violated Exhibit C of Section 1930–C in the past have all been sent servicing letters demanding they come into compliance with Agency instructions; 2. The follow-up servicing actions report a high percentage coming into compliance with Agency regulations; and 3. A limited number of rebates or credits actually collected ....

(*Id.*) Vollmer supported these conclusions based upon an attached summary report purporting to be enforcement statistics. (*Id.*)

Plaintiffs are rightly skeptical of the attached summary report and statistical analysis. There are omissions in the statistics which are apparent on the face of the summary sheet. (*Id.; i.e.,* incomplete data for Vermont.) It does not appear that the Federal Defendants in compiling these statistics have studiously checked the summary against the individual records of borrowers. (*See* Christine M. Wassmann Declaration.) Some field offices in key states also may not have followed AN policy in determining the extent of violations. (*See* Plaintiffs' Memorandum in Support of Plaintiffs' Renewed Motion for Post–Judgment Relief at 25–28.)[4] However, it is difficult, if not impossible, to determine from the available records the extent to which the statistics are misleading. Plaintiffs' estimates of the violation statistics, not unlike Defendants' estimates, are self-serving and contain mistakes and miscalculations. (*See* Defendants' Opposition at 16 n. 4.) Overall, the Court does not believe that Plaintiffs' statistics are more reliable than the figures prepared by the Federal Defendants. In fact, the Federal Defendants have a distinct advantage in reporting the statistics since they have a better knowledge of the underlying data.

Of course, the most significant defect in the enforcement statistics is that they only relate to the period between the issuance of the AN on August 7, 1996 and its expiration on July 31, 1997. After the expiration of the AN, field office employees stopped compiling summary records and the National Office stopped assessing the extent of compliance. (Affidavit of O. Baker, Jr.—Dkt. No. 406; Defendants' Exhibit 7.) The AN was later re-issued on April 14, 1999 and is set to expire on March 31, 2000. (Plaintiffs' Exhibit 7.) According to the Federal Defendants, the expiration of the AN does not affect the Agency's policy, which remains the same regardless of whether the AN has expired. (Defendants' Exhibit 7.) However, the expiration of the AN did halt periodic reporting of enforcement (*id.*), which has the effect of eliminating oversight concerning Section 514 housing. Although it is impossible to speculate about the data after reporting stopped, there is no reason to suppose that enforcement improved in the absence of agency oversight.

While a lack of oversight is not laudable, the terms of the AN in question deserve praise. The Administrative Notice provides in pertinent part:

4. Giving the Federal Defendants all due deference, the Court does accept much of their contentions about the disputed enforcement records of key states. However, the Court is disturbed by the Federal Defendants' explanation for the Arkansas office's record of enforcement in one important respect. The record shows that State Director explicitly instructed field workers that borrowers who had not obtained Department approval for utility charges, but who had an "initial understanding" that the utility charges need not be approved, need not rebate or credit the unauthorized utility charges to tenants. (*See* Plaintiffs' Exhibit 10; Defendants' Exhibit 30.) This "interpretation" flatly contradicts

the language of the regulations and the Federal Defendants' own AN—both of which require that the Agency enforce the borrower's duty to rollback and rebate or credit tenants as to any unauthorized occupancy charges. The Court by this note warns the Agency not to use this technique to improperly thwart its enforcement duties in the future. The same warning applies to the improper technique of allowing borrowers to prepay loans without scrutiny of whether the borrowers have neglected to rebate or credit to tenants unauthorized occupancy charges. (*See* Arner & Wassmann Decl. at 5.) Neither of these practices should be used by the Agency as a means of circumventing the regulations.

Field office employees are to ensure that owners on-farm LH financed under Section 514 are not charging for rent, utilities, refundable damage deposit charges, or cleaning fees to residents, unless the rent, charges and fees are approved by authorized officials in accordance with Exhibit C to RD Instruction 1930–C. When violations are evident the owner will be asked, in writing, to come into compliance. In particular, the provisions of paragraphs IV, V and VI of Exhibit C to RD. Instruction 1930–C must be met by borrowers. Tenants must receive proper notification and an opportunity to comment on proposed rent changes. Borrowers should arrange to request rent changes during periods when migrant residents can be readily contacted. Making requests during the off farm season when tenants are not occupying the units does not excuse the borrower from the responsibility to make effective notification to tenants. Tenants must also receive notice of any approved charges authorized by the Agency prior to imposing charges. *Borrowers imposing unauthorized charges must be notified in writing by the Agency that they must roll back rates retroactively to the last authorized level. The borrower must give tenants a rebate or credit for the unauthorized charges.*

*Borrowers unable or unwilling to comply with Agency regulations will be serviced in accordance with RD Instruction 1965–B. Borrowers with known violations must be brought into compliance or subjected to servicing actions which may include, but not be limited to, added Agency supervisory visits, inspections, and reviews; acceleration; suspension; debarment; and referral to local, state, or Federal officials for investigation and prosecution of violations of civil and criminal law.*

(Plaintiffs' Exhibit 7 at 2 (*emphasis added*).) These policies are carried out in particular sections of the AN. Section V of the AN particularly concerns Servicing Actions. As indicated in this policy statement and other agency correspondence, the Federal Defendants interpret their policies as imposing mandatory requirements on field agents as to the Section 514 housing program.

As indicated in the Vollmer Report, the borrower records, the affidavits, and the deposition testimony, the percentage of unauthorized rental charges billed to tenants by Section 514 borrowers has declined since the onset of enforcement. Plaintiffs assert that approximately 30 percent of borrowers remain non-compliant as opposed to the 60 percent non-compliant at the time the Judgment was entered. (Plaintiffs' Renewed Motion at 41; Defendants' Opposition at 16.) The Defendants claim that more like 16 percent are non-compliant. (Defendants' Opposition at 16.) Regardless of which figure is used, the statistics show a marked improvement in borrower compliance with the rental approval process. Federal Defendants' records also indicate that they have sent a large number of borrowers letters informing them of unauthorized charges. (Plaintiffs' Exhibit 3.) The Vollmer statistics suggest the Agency informed 100 percent of known, non-compliant borrowers of their non-compliance. (*Id.*) Plaintiffs, on the other hand, estimate that Federal Defendants have informed borrowers of unauthorized charges in slightly less than one-half of problem cases (111 of 251 problem cases). (*See* Plaintiffs' Memorandum at 41–42; Arner & Wassmann Decl. at 4.) The Court believes, regardless of the precise statistics, that the Federal Defendants have made a drastic improvement in requiring borrowers to obtain approval for rental and utility charges and in initially notifying borrowers of improper rent and utility charges. This improvement shows that, at least for this time period, the Federal Defendants ceased in their policy of non-enforcement in the approval and the notification process.

Troubling, though, is the Federal Defendants' record in enforcing rebates and credits. Plaintiffs' statistics confirm that

they have rarely moved beyond sending an initial servicing notice to borrowers to enforce the rebate or credit duty. (Arner & Wassmann Decl. at 4.) Plaintiffs estimate that they have rarely sent second and last notices to borrowers and have generated "problem case reports" for non-compliant borrowers in less than 5 percent of cases. (*Id.*) The Vollmer Report also confirms that enforcement has resulted in only a small percentage of rebates. (Plaintiffs' Exhibit 3.) The Plaintiffs indicate that the real percentage is between 2 and 5 percent (a handful of borrowers) and that rebates paid have been nominal. (Plaintiffs' Reply at 3; Renewed Motion at 45; Arner & Wassmann Decl. at 4.) Vollmer acknowledged the weakness of the record of rebates in admitting that the "Agency is somewhat vulnerable to arguments that the record of rebates and credits collected shows full compliance was achieved in less than 10% of the cases." (Plaintiffs' Exhibit 3 at 373.)

This disparity between initial notification of borrowers of unauthorized charges and the actual collection of rebates and credits is attributed by Plaintiffs to a number of factors including: second and last notices are very rarely sent; problem cases are very rarely generated; field offices in key states have decided not to enforce the rebate duty for most borrowers; field staffing is inadequate; some field staff is unmotivated to collect rebates caused by their previous bad advice; the National Office has encouraged non-enforcement of the rebate duty; *etc.* (Renewed Motion at 25–28, 34–45.) Whatever the cause, Plaintiffs are correct in concluding that "the Agency's unofficial policy with regard to unauthorized charges is to ignore them." (Plaintiffs' Memorandum at 45.) So long as the borrowers receive only an initial servicing letter informing them of non-compliance without threat of later enforcement, few rebates will be paid and the Federal Defendants' enforcement of the rebate or credit duty will remain essentially fictional.

## B. Modification of Permanent Injunction

This Court entered its Permanent Injunction based on the record which showed a complete abdication of mandatory regulatory duties. Given that the Federal Defendants virtually never enforced their mandatory regulations, the legal authority for doing so under the Administrative Procedures Act was ample. *See Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir.1973); *Northern Indiana Public Service Co. v. Fed. Energy Reg. Comm.*, 782 F.2d 730, 745 (7th Cir.1986); *Shell Oil Co. v. Environmental Protection Agency*, 950 F.2d 741 (D.C.Cir.1991); *Greater Los Angeles Council v. Baldrige*, 827 F.2d 1353 (9th Cir.1987); *Montana Air Chapter No. 29 v. FLRA*, 898 F.2d 753 (9th Cir.1990); *see also Heckler v. Chaney*, 470 U.S. 821, 833 n. 4, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (citing *Adams*); *Gillis v. United States Dept. of Health & Human Services*, 759 F.2d 565, 578 (6th Cir.1985) (citing *Adams*).

Now that the Permanent Injunction has been entered, the Federal Defendants take the position that it may be modified only upon a new showing of a policy of abdication—which they contend does not exist on the present record. Their premise, that there is no longer a policy of abdication, is accurate as to the notification and approval duty, since the Agency has taken active steps to inform borrowers of regulatory requirements and to approve rental charges. However, the non-enforcement of the rebate or credit duty represents a continued policy of abdication such that further injunctive relief is clearly necessary.

Furthermore, the Federal Defendants' legal premise that a further injunction requires proof of a continued policy of abdication is itself mistaken. This statement confuses the standard for originally entering an injunction in an Administrative Procedures Act case of this kind with the standard for modifying such an injunction once entered. Under federal law and Fed-

eral Rule of Civil Procedure 60(b)(5), parties affected by an injunction are entitled to move the injunction's modification. The standard of proof for modification depends in large part on the kind of modification sought. As the Eleventh Circuit recently explained:

Upon appellate review, "[m]otions for relief from a final judgment are addressed to the sound discretion of the district court, guided of course by accepted legal principles." *Hand v. United States*, 441 F.2d 529, 531 (5th Cir. 1971). In this case, those legal principles were set out long ago in *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) and its progeny. In *United Shoe*, the United States as plaintiff sought to modify a ten-year-old consent decree and injunction in an antitrust case, arguing that the divestiture goals of the order could only be achieved through further court action. *United Shoe*, 391 U.S. at 247, 88 S.Ct. at 1499. The Supreme Court held the district court had the power to grant the relief requested if the Government showed the decree had failed to accomplish the results it was designed to achieve. *United Shoe*, 391 U.S. at 251–52, 88 S.Ct. at 1500–01. The Court distinguished its prior decision in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), in which the Court set a higher standard for modification of a decree or injunction when "defendants sought relief not to achieve the purposes of the provisions of the decree, but to escape their impact." *United Shoe*, 391 U.S. at 249, 88 S.Ct. at 1500 (emphasis added).

*Epic Metals Corp. v. Souliere*, 181 F.3d 1280, 1283 (11th Cir.1999).

■ Accordingly, the Court determines that the operative question here is not whether there is now a complete abdication but whether the purpose of the injunction has been fulfilled. In this case, because the goal of the injunction is to enforce the regulatory duties, the Plaintiffs need only prove that the enforcement of the regulatory duties has been unfulfilled. *See United Shoe*, 391 U.S. at 247, 88 S.Ct. 1496; *Epic Metals Corp.*, 181 F.3d at 1283; *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 364–65 (6th Cir.1990).

■ Based on the record, the Court now concludes that the purpose of the injunction has gone unfulfilled in part. One basic purpose of the Injunction was to ensure illegal rental charges be disgorged and repaid to tenants. The evidence shows that no significant progress has been made in obtaining rebates and credits from borrowers. Since the purpose of the previous Injunction has gone unfulfilled in this regard, additional remedies are now needed.

### C. Modifications Requested

■ On the issue of injunctive relief, the Federal Defendants have cited numerous cases for the proposition that the courts should generally not mandate specific agency action and should instead explain the law and remand for agency action consistent with the explication. However, the circumstances of those cases do not apply here. As was implied in the *Bresgal* and *Global Van Lines* decisions, remand is a starting place which, if ignored, must lead to more extensive remedies. Congress enacted the Administrative Procedures Act to make available the power of equity and injunction. *See* 5 U.S.C. §§ 703, 706. For this reason, the Ninth Circuit Court of Appeals in *Sierra Pacific Industries v. Lyng*, 866 F.2d 1099, 1111 (9th Cir.1989), quoting the United States Supreme Court, stated that:

Our inquiry into the district court's authority to order equitable relief begins with the well-established principle that "while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." *Ford Motor Co. v. NLRB*,

305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939).

*Sierra Pacific,* 866 F.2d at 1111. Thus, the "district court must weigh 'the competing claims of injury … and the effect on each party of the granting or withholding of the requested relief.'" *National Wildlife Fed'n v. Espy,* 45 F.3d 1337, 1343 (9th Cir.1995) (quoting *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). Furthermore, these conclusions follow as a matter of logic and commonsense. Without the power to go beyond a remand order which was ignored, Article III courts would be transformed into toothless tigers without effective control of lawless agencies.

This leads to the question of which, if any, of the remedies proposed by Plaintiffs should be ordered. Plaintiffs have proposed that the Federal Defendants be enjoined to:

1. Reissue the AN upon its expiration in April 2000 for a period of at least three consecutive years;

2. Notify by servicing letter borrowers found to be in non-compliance on or after February 9, 1996 of the requirement that they roll back charges to the previously approved level and refund or credit unauthorized charges to affected tenants;

3. Send a second request letter as described in the AN to all borrowers who do not adequately respond to the initial letter;

4. Send a final warning letter as described in the AN to all borrowers who do not adequately respond to the second letter;

5. Forward a problem case report to the State Director for enforcement as to all borrowers who have not adequately responded to a final warning letter as described in the AN;

6. Obtain all documents from borrowers showing compliance with Exhibit C to FmHA Instruction 1930–C if tenants are being charged for rent, utilities, refundable security deposits or cleaning fees;

7. Provide detailed quarterly reports of compliance, under seal, to Plaintiffs and the Court with supporting documentation for each borrower in accordance with the provisions of Exhibit C;

8. Instruct its staff that they may not neglect enforcement based upon the borrower's "initial understanding" of the definition of "rent;"

9. Instruct its staff to require borrowers to show proof of rebate to tenants of unauthorized charges (or to tender rebate to the Federal Defendants for distribution) before accepting prepayment of Section 514 loans;

10. Make public service announcements (in English and Spanish) apprizing tenants of the provisions of the Section 514 program affecting them; and

11. Assign additional staff to the Section 514 loan program.

■■ Much of the relief requested is essentially a request that the AN be judicially ordered so as to be judicially enforced, if necessary. As the Court has stated above, many of these provisions are not specifically warranted at this time because the Federal Defendants have remedied some problems. More specifically, items 2, 6, 8, 9, 10, and 11 are not appropriate for injunctive order at this time. Item 2 (servicing notices) is not appropriate because the record of enforcement shows that the Federal Defendants have sufficiently notified borrowers by servicing letters of non-compliance. Item 6 (borrower record-keeping) is not appropriate because the record of enforcement shows that the Federal Defendants have sufficiently compiled borrower records of compliance. Item 8 ("initial understanding policy") is not appropriate for injunction because there is no program-wide misreading of the regulations (or the AN) of this kind.[5] Item 9 ("pre-payment avoidance

---

**5.** This statement in no way condones those delinquent offices like Arkansas, which have adopted contrarian policies, without the assent of the National Office.

policy") is not appropriate for injunction because there is no programmatic failure of the Agency as to pre-payment avoidance.[6] Item 10 ("public announcements") is not appropriate because this constitutes an impermissible form of injunction dictating the Agency to use its resources in a particular way (public announcement) and in lieu of other alternatives to attain enforcement. While not so ordering, the Court takes no position on whether this would be an effective or the most effective route for enforcement. Item 11 ("additional staff") is not appropriate because this constitutes an impermissible form of an injunction dictating the Agency to use its resources in a particular way (employment of additional staff) and in lieu of other alternatives to attain enforcement. While not so ordering, the Court takes no position on whether this would be an effective route for enforcement.

■ Notwithstanding, the Court does agree that items 1, 3, 4, 5 and 7 should be ordered by way of injunction. Item 1(extension of the AN) is necessary to keep agency staff informed about the Agency's own policy for ongoing enforcement, to keep supervisory staff informed about the success of their efforts, and to keep field staff sensitive to the efforts of supervision. The failure of the Agency in the past to order the extension of the AN is principally responsible for an effective loss of oversight as to the program during the period of lapsed reporting, which must be avoided in the future if the regulations are to be enforced. The extension of the AN in this respect is minimally intrusive since it represents the Agency's own current and prospective policy.

■ Item 3 ("second notices") is necessary because the record of enforcement shows that the Federal Defendants have, in programmatic manner, failed to send second notices of non-compliance. This has contributed to the programmatic failure of borrowers to provide rebates or

credits. The extension of the AN in this respect is minimally intrusive on the Agency since it represents the Agency's own current and prospective policy. Item 4 ("final notices") is likewise necessary because the administrative record shows that the programmatic failure to send final notices of noncompliance has contributed to the programmatic failure of borrowers to pay rebates or credits. The extension of the AN in this respect is minimally intrusive to the Agency.

■ Item 5 ("problem reports") is necessary by way of injunction because the enforcement record shows that the failure to take steps other than notifying borrowers (especially at the problem report stage) has contributed to the large-scale failure of borrowers to rebate or credit tenants. The extension of the AN in this respect is minimally intrusive on the Agency since it represents current and prospective agency policy.

■ Item 7 ("reporting") is necessary by way of injunction because the Agency has failed in a systematic way to enforce its rebate or credit duty. Item 7 will, perhaps more so than any other provision, foster Agency and borrower compliance because it will ensure that the extent of enforcement is known to interested parties (Plaintiffs) and the Court. It is not intrusive on the Agency since it represents only the sharing of Agency records in a discovery-like process.

### CONCLUSION

This Court entered its Judgment on February 9, 1996 hopeful that a simple remand to the Federal Defendants would result in enforcement of mandatory regulatory duties that had been completely neglected. When in March 18, 1999, the Court denied the Plaintiffs' Motion for Post–Judgment Relief and granted discovery it was hopeful that the record of post-

---

**6.** This is not to say that the Federal Defendants cannot improve enforcement in this respect.

judgment enforcement would not require further remedy. However, the evidence of post-judgment enforcement of the rebate or credit duty is so lacking that the Court must order the Federal Defendants to do more. An Order Amending Judgment shall issue consistent with this Opinion.