Rogelio ROMAN, et al., Plaintiffs,

v.

Gerald KORSON, et al., Defendants.

No. 1:91–CV–274.

United States District Court,
W.D. Michigan,
Southern Division.

March 1, 2004.

Fred R. Wagner, April Roach, Gideon Anders, Stephen M. Arner, Washington, DC, Teresa M. Hendricks, Grand Rapids, MI, and Roger Rosenthal, Washington, DC, for Plaintiffs.

Rupa Bhattacharyya, Michael Sitcov, Rachel Hines, Peter Keisler, Frank Crummer, Washington, DC, Margaret M. Chiara, Cassopolis, MI, and Agnes Kempker–Cloyd, Grand Rapids, MI, for Defendants.

## OPINION

ENSLEN, District Judge.

### BACKGROUND

This class action lawsuit was filed in 1991 to challenge the systematic failure of the Department of Agriculture and the Farmer's Home Administration[1] to en-

---

1. The Farmer's Home Administration has been succeeded in office by the Rural Housing Service and Rural Development, which is now the responsible agency within the Department of Agriculture. The Federal agencies and their officers who are named as Defendants are addressed here as the "Federal Defendants" to distinguish them from private Defendants who were previously terminated from this suit through the entry of a Consent Judgment.

force mandatory regulatory duties of the Section 514 loan program, authorized under 42 U.S.C. § 1484. The program was designed to provide loans to borrowers to build housing for domestic farm labor. The mandatory regulations require borrowers to submit budgetary information demonstrating "the need and justification" of proposed rental and utility charges, obtain advance approval of rental and utility charges, bill tenants consistent with the approved rates, notify tenants of approved changes to rent and utility charges, and, in the event of unauthorized rental charges, rollback and rebate or credit the affected tenants. 7 C.F.R. Pt.1930, Subpart C, Ex. C, III & VI.

This Court certified this class on November 30, 1993. The class was defined as:

> All agricultural workers in the United States who reside, have resided or will reside in FmHA § 514 housing projects operating without loan agreements who have been or will be charged unauthorized rent and/or utilities.

*Roman v. Korson*, 152 F.R.D. 101 (W.D.Mich.1993). Federal Defendants' statistics indicate that there were 274 noncompliant borrowers who rented to tenants meeting this definition. (12th Quarterly Report, Ex. A at 1, Col. 2.)

By Order and Opinion of July 25, 1995, this Court determined liability against Federal Defendants and held that: (1) the Department of Agriculture abdicated its regulatory responsibilities by failing to enforce labor housing regulations requiring borrowers to follow notice and comment procedures prior to increasing rents and to roll back and refund illegally charged rent; and (2) the Department of Agriculture acted arbitrarily and capriciously in enforcing labor housing regulations that allowed borrowers to be exempt from the loan agreement requirement and from the reporting requirement relating to charging of rent if

borrowers stated that they would not charge rent. *Roman v. Korson*, 918 F.Supp. 1108, 1113–14 (W.D.Mich.1995).

After further briefing, the Court then entered its Judgment and Permanent Injunction against the Federal Defendants. The Court determined consistent with the decisions in *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir.1987) and *Global Van Lines v. Interstate Commerce Comm'n*, 804 F.2d 1293, 1305 n. 95 (D.C.Cir.1986) that it was preferable to first allow the agency to self-correct its policy of non-enforcement. Therefore, the Court merely enjoined "Federal Defendants and their successors in office .. to CEASE in their failure to enforce the rollback and rebate or credit duty" and "to CEASE in their failure to enforce the notice and comment duty." (J. & Permanent Inj. of Feb. 9, 1996.) The Court's Opinion, however, warned Federal Defendants that failure to take enforcement action would result in future remedies. (Feb. 9, 1996 Op., at 4 & n. 2.)

Plaintiff later moved for post-judgment relief on December 17, 1999. This motion was granted by an Opinion and Order Amending Judgment entered on March 21, 2000. *Roman v. Korson*, 89 F.Supp.2d 899, 908–09 (W.D.Mich.2000). The Opinion recognized that the Federal Defendants had made some efforts to notify borrowers of the mandatory regulations, but also further recognized that the Federal Defendants had essentially made no efforts to enforce those mandatory regulations as to noncompliant borrowers (in over 90 percent of the cases of noncompliant borrowers). *Id.* at 905. To that date, while borrowers did receive "initial servicing letters," the lack of further enforcement action demonstrated that the Federal Defendants' enforcement was "essentially fictional." *Id.* The Opinion also warned Federal Defendants against using tech-

niques such as accepting prepayment of section 514 loans as a method of avoiding borrower compliance. *Id.* at 903 n. 4. The Court then modified the previous general injunction by requiring the extension of the effective dates of the Federal Defendants' Administrative Notice (the policy document authored to ensure compliance) for three years, by directing the Federal Defendants to perform certain enforcement measures detailed within their own Administrative Notice with respect to noncompliant borrowers, and by directing reporting as to compliance during the three years. (Order Amending J.) The Administrative Notice lapsed in March 2003, but has since been voluntarily extended through 2004. (RD AN No. 3924 (1930–C), exp. date Dec. 31, 2004.)

In accordance with the Order Amending Judgment, the Federal Defendants have filed quarterly reports concerning their compliance. The last quarterly report filed, the Twelfth Quarterly Report, was filed with the Court on September 18, 2003 and relates to data collected by them through March 31, 2003. (12th Quarterly Report, Dkt. No. 527, Ex. A.) The data collected by them shows that the Federal Defendants have obtained roughly 50 percent compliance with their mandatory regulations (*id.*)-though the data is somewhat questionable because of the history of mis-reporting data in this case. (*See* April Roach Decl. at ¶¶ 8–9.) As of March 31, 2003, according to these statistics, they had obtained compliance of 139 of 274 noncompliant borrowers. (*Id.*, at 1, Cols. 2 & 4.) Of those borrowers, the majority of them are located in six states which extensively utilize tenant farm laborers. Those states are Arkansas (with 125 noncompliant borrowers), Hawaii (with 16 noncompliant borrowers), Michigan (with 50 noncompliant borrowers), Mississippi (with 10 noncompliant borrowers), Tennessee (with 15 noncompliant borrowers), and Vermont (with 38 noncompliant borrowers). (*Id.*) Of those states, almost all have obtained some significant level of compliance among noncompliant borrowers except for Arkansas (only 22 of 125 noncompliant borrowers have come into compliance) and Hawaii (0 of 15 noncompliant borrowers have come into compliance). (*Id.*) While these are only two states, they represent a large percentage of the program total of noncompliance because of the large programs in these states. Most distressing of the data reported is the small number of servicing actions instituted regarding problems cases. While all noncompliant borrowers in Hawaii were subjected to servicing actions, only 7 of 103 noncompliant borrowers in Arkansas were subjected to servicing. (*Id.* at Col. 7.) This is so despite the requirement of the Order Amending Judgment that Federal Defendants comply with section 5E (requiring servicing actions) of the Administrative Notice regarding noncompliant borrowers.

Plaintiffs estimate that only 5.4 percent of the illegal rental and utility charges have been collected by Federal Defendants. (Roach Decl. at ¶ 16.) Federal Defendants' statistics, though, suggest a slightly higher level of collection in that they have obtained credits or rebates in 71 of 274 cases of noncompliant borrowers, 26 percent. This difference, though, mostly relates to the fact that Plaintiffs are tracking success as to the total amount of the charges and Federal Defendants are tracking the percentage of cases in which rebates were paid. What the numbers tend to show is that either Federal Defendants are not obtaining rebates from borrowers who owe large rebates, are accepting only nominal rebates in those cases, or both.

On September 12, 2003, after reviewing the pertinent reports concerning borrower compliance and other information, Plain-

tiffs filed the instant Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt. In the contempt motion, Plaintiffs argued that the following acts were contemptuous: (1) the failure to submit the last two quarterly reports required by Order Amending Judgment; (2) the failure to obtain rebates or credits of more than 5 percent of the total estimated unauthorized rental or utility charges; (3) the failure to send "secondary request letters" to many noncompliant borrowers; (4) the failure to send "last notice" letters to many noncompliant borrowers; (5) the failure to take "servicing actions" as to many noncompliant borrowers; and (6) the knowing allowance of certain practices by agency staff which are deliberately calculated to frustrate enforcement, *i.e.*, allowing retroactive approval of utility charges, non-enforcement of prepaid loans, and other waivers and exceptions to mandatory enforcement.

In response, Federal Defendants have both moved to dismiss the contempt motion based on lack of standing and argued that contempt sanctions are unwarranted because there have been no violations of a "clear and definite" court order shown by "clear and convincing evidence."

Both sides have had the opportunity to file reply briefs and sur-reply briefs to fully explain their positions on the pending motions. The Court has also reviewed a large number of exhibits, which includes declarations, quarterly reports, portions of noncompliant borrower files, charts and reports prepared by the parties, and correspondence concerning noncompliant borrowers.

## MOTION TO DISMISS

### A. Legal Standards

Federal Defendants have moved for dismissal due to lack of standing and lack of subject matter jurisdiction. Though the parties have not discussed the underlying procedure, it is clear that the instant motion is one filed pursuant to Federal Rule of Civil Procedure 12(b)(1).

There are essentially two kinds of Rule 12(b)(1) motions-"facial attacks" on jurisdiction and "factual attacks" on jurisdiction. The Sixth Circuit Court of Appeals explained the distinction in *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125 (6th Cir.1996):

The various Rule 12 motions to dismiss on the pleadings (and the standards applicable to such motions) are often confused with each other. In the oft-quoted decision of the Third Circuit in *Mortensen v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 890 (3d Cir.1977), the court explained the distinction between dismissals under Rule 12(b)(1) and Rule 12(b)(6):

The basic difference among the various 12(b) motions is, of course, that 12(b)(6) alone necessitates a ruling on the merits of the claim, the others deal with procedural defects. Because 12(b)(6) results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn. The decision disposing the case is then purely on the legal sufficiency of plaintiff's case: even were plaintiff to prove all its allegations he or she would be unable to prevail. In the interests of judicial economy it is not improper to dispose of the claim at that stage. If the court considers matters outside the pleadings before it in a 12(b)(6) motion, the above procedure will automatically be converted into a Rule 56 summary judgment procedure. Here there are further safeguards for the plaintiff: in addition to having all of plaintiff's allegations taken as true, with all their fa-

vorable inferences, the trial court cannot grant a summary judgment unless there is no genuine issue of material fact.

*The procedure under a motion to dismiss for lack of subject matter jurisdiction is quite different. At the outset we must emphasize a crucial distinction, often overlooked between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. Pro. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case-there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover the plaintiff will have the burden of proof that jurisdiction does in fact exist.*

549 F.2d at 891 (emphasis added). *RMI Titanium Co.*, 78 F.3d at 1134.

In this case, this Rule 12(b)(1) motion is very clearly a factual attack. The pertinent record of evidence consists of the many administrative records and exhibits filed by the parties, including the quarterly reports filed by Federal Defendants, the portions of noncompliant borrowers files, and correspondence and government forms pertinent to noncompliant borrower files as well as other pertinent court documents.

### B. Legal Analysis

When Federal Defendants' argument over standing is distilled, it operates from a simple premise-that contempt sanctions cannot be sought by named class representatives and their attorneys since the class representatives' claims themselves are moot (*i.e.*, the class representatives have already obtained rebates or credits as to improper rents and utilities charged to them) and it cannot be sought by unnamed class representatives because they have not received permission to intervene.[2] While this is a simple argument, it is also simply wrong.

Federal Defendants' argument fails precisely because its first premise (the argument about mootness) is faulty and fails to appreciate the context of this case-a class action in which liability and relief have previously been determined and the pending contempt issues pertain to the extent of class-wide compliance. The many cases cited by Federal Defendants' all concern

---

**2.** Federal Defendants also make a different factual argument-that because unnamed class members have not sought refunds from a fund established for tenant repayment in cases in which tenants could not be located, unnamed class members are uninterested in enforcement. This is false and extremely misleading. The reason that such claims have not been filed is because there has been no effective notification of affected farm workers and because the fund, by its nature, relates to those who cannot be located. Furthermore, it is noteworthy that the great majority of the money collected by Federal Defendants has been actually refunded or credited to tenant class members-who are presumably pleased with that result.

different contexts-contempt claims made by a non-party in non-class action suits or liability claims made in class actions wherein the claims became moot before liability and remedy were determined. The most pertinent case cited by Federal Defendants is *Glover v. Johnson*, 931 F.Supp. 1360, 1371 (E.D.Mich.1996), *aff'd in part and rev'd in part on other grounds*, 138 F.3d 229 (6th Cir.1998). *Glover* was a prisoner class action suit wherein liability was decided in 1979, but contempt proceedings were still ongoing in 1996. In that context, Judge Feikens held:

> Moreover, Plaintiffs clearly have standing to challenge Defendants' violations of this Court's remedial orders. Civil contempt proceedings are a supplemental part of the original action from which they stem.... The remedial orders, which were proposed *by Defendants* as the manner by which they wanted to provide equal protection and access, were entered as relief for the entire Plaintiff class. Therefore, any member of the class has standing to challenge a violation of these orders in a contempt proceeding.

*Id.*

While this *dicta* in *Glover* is pertinent because it concerns this same context, the holding and *dicta* in *Hadix v. Johnson*, 182 F.3d 400, 406 & n. 3 (6th Cir.1999) and *Ball v. Wagers*, 795 F.2d 579 (1986), as characterized by Federal Defendants, are not pertinent because they concern a different context-an initial liability determination of a class action claim.

Another pertinent case cited by Federal Defendants is the case of *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). *Sosna* made explicit as to class action cases the following rules as to standing:

> [T]he issue sought to be litigated ... does not inexorably become moot by the intervening resolution of the controversy as to the named plaintiffs... There must be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified ..., [and] there must be a live controversy at the time this Court reviews the case.... The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot.

*Id.* at 402–03, 95 S.Ct. 553 (citations omitted).

 In this case, as required by *Sosna*, the standing requirement was met by named class members at the time of class certification and the findings of liability. Standing has long gone unchallenged by Federal Defendants. They raise the issue only now as a defense to a contempt citation long after the entry of a judgment in favor of the class. As in *Sosna*, it is not surprising in this context that the claims of the class representatives have since been satisfied. As in *Sosna*, notwithstanding the resolution of the claims of class representatives, there remains an active controversy between Federal Defendants and a great number of the class members, whose claims have not been satisfied. It is axiomatic that if the settlement of the claims of class representatives does not moot a controversy on appeal for standing purposes, it will not moot a post-judgment contempt controversy as to which many unnamed class members still have an active stake that can be represented by named class members. Furthermore, the import of Federal Defendants' argument would have the effect of preventing many class action judgments involving injunction relief from being enforced post-appeal because, on their logic, they could moot any such controversy as to the entire class by providing

relief to only the named class members. Such a position makes little sense in the context of this case-where the real issue is the degree of enforcement of mandatory regulatory duties as to all class members. The entire class action process would be undermined were the Court to require all of them to participate in the proceedings as a condition for obtaining enforcement of their rights. Accordingly, the Motion to Dismiss will be denied.

## CONTEMPT MOTION

### A. Legal Standards for Contempt

 In order to hold a party in contempt, there must be a showing by clear and convincing evidence that the party has violated a definite and specific court order requiring the party to perform a particular act or to refrain from performing a particular act. *Rolex Watch U.S.A., Inc. v. Crowley,* 74 F.3d 716, 720 (6th Cir.1996); *Chicago Truck Drivers v. Brotherhood Labor Leasing,* 207 F.3d 500, 504–06 (8th Cir.2000). Wilfulness is not an element of civil contempt and need not be shown. *Rolex,* 74 F.3d at 720.

 Once a *prima facie* violation is shown, the burden shifts to the respondent to either rebut the showing or to establish a defense such as inability to comply. *Rolex,* 74 F.3d at 720; *Chicago Truck Drivers,* 207 F.3d at 505–06. To prove inability to comply, "a defendant must show 'categorically and in detail' why he or she is unable to comply with the court's order." *Rolex,* 74 F.3d at 720 (quoting *Donovan v. Mazzola,* 716 F.2d 1226, 1240 (9th Cir. 1983)). This burden cannot be met by evidence that a respondent has made itself incapable of compliance since a "self-induced" impossibility is not a valid defense. *Chicago Truck Drivers,* 207 F.3d at 505–06; *Central States Pension Fund v. Wintz Properties,* 155 F.3d 868, 875 (7th Cir. 1998).

### B. Legal Standards for Amendment of Judgment

As part of the contempt motion, Plaintiffs have also requested amendment of the Order Amending Judgment and have cited law regarding the standards for amendment of judgment. As this Court has previously determined, the pertinent standard for amendment under Federal Rule of Civil Procedure 60(b)(5) was set forth in *Epic Metals Corp. v. Souliere, Sr.,* 181 F.3d 1280, 1283 (11th Cir.1999):

"Motions for relief from a final judgment are addressed to the sound discretion of the district court, guided of course by accepted legal principles." *Hand v. United States,* 441 F.2d 529, 531 (5th Cir.1971). In this case, those legal principles were set out long ago in *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) and its progeny. In *United Shoe,* the United States as plaintiff sought to modify a ten-year-old consent decree and injunction in an antitrust case, arguing that the divestiture goals of the order could only be achieved through further court action. *United Shoe,* 391 U.S. at 247, 88 S.Ct. at 1499. The Supreme Court held the district court had the power to grant the relief requested if the Government showed the decree had failed to accomplish the results it was designed to achieve. *United Shoe,* 391 U.S. at 251–52, 88 S.Ct. at 1500–01. The Court distinguished its prior decision in *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), in which the Court set a higher standard for modification of a decree or injunction when "defendants sought relief not to achieve the purposes of the provisions of the decree, but to escape their impact." *United Shoe,* 391 U.S. at 249, 88 S.Ct. at 1500 (emphasis added).

*Id.* In the instant case, because the goal of the injunction is to enforce the mandatory regulatory duties, the Plaintiffs need only prove that the enforcement of the regulatory duties has gone unfulfilled. *See United Shoe*, 391 U.S. at 247, 88 S.Ct. 1496; *Epic Metals Corp.*, 181 F.3d at 1283; *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 364–65 (6th Cir.1990).

### C. Legal Analysis

### 1. Contempt Findings

Plaintiffs have argued that the following acts were contemptuous: (1) the failure to submit the last two quarterly reports required by Order Amending Judgment; (2) the failure to obtain rebates or credits of more than 5.4 percent of the total estimated unauthorized rental or utility charges; (3) the failure to send "secondary request letters" to many noncompliant borrowers; (4) the failure to send "last notice" letters to many noncompliant borrowers; (5) the failure to take "servicing actions" as to many noncompliant borrowers; and (6) the knowing adoption of certain practices by Federal Defendants which are deliberately calculated to frustrate enforcement, *i.e.*, allowing retroactive approval of utility charges, non-enforcement of prepaid loans, and other waivers and exceptions to mandatory enforcement. The Court will now address these areas *seriatim*.

■ Regarding the failure to timely submit the last two quarterly reports, the Court finds there to be no knowing violation of the Court's previous Order Amending Judgment. Though the Court's Order did require the filing of reports quarterly, this process was complicated by the fact that the parties had ongoing discussions to ensure that the reporting remained accurate and useful. Though the Court does not excuse either filing inaccurate reports or filing reports belatedly, the present record is insufficient to support a finding that the Federal Defendants have knowingly engaged in late or inaccurate reporting by clear and convincing evidence.

■ Regarding the extent of the enforcement, there are no provisions of any court order approved by this Court requiring that Federal Defendants obtain collection of any percentage of the estimated unauthorized rental and utility charges. Even if the Court had ordered such, which it did not, there would be no legal basis for holding Federal Defendants in contempt for the extent of the repayment. This is because, to put the matter succinctly, the extent of repayment is not within Federal Defendants' control. Federal Defendants control only the extent of their own activities in enforcing their mandatory regulations. They do not control the payment decisions made by noncompliant borrowers nor do they control the private finances of those borrowers. As such, no finding of contempt is permitted on this basis. With this said, the extent of the rebates and credits obtained is relevant to the related issue of whether the judgment should be amended.

Regarding the sending of both secondary and last notices to noncompliant borrowers, the real controversy in this area is not related to the sending of the notices themselves. As Federal Defendants statistics purport to show, *in those cases in which some exception was not made for noncompliant borrowers*, Federal Defendants have customarily sent such notices. Federal Defendants' statistics show that 82 percent of noncomplaint borrowers have received at least collection notices. (Fed. Defs.' Combined Resp., at 30 & Ex. J.) However, the real controversy pertinent to this category pertains to the making of exceptions, which is discussed below. There is also a controversy pertaining to the timing of defense actions-since the orders in question contained no explicit deadlines for the sending of such notices.

This issue is also discussed below. Suffice it to say, with the exception of related contempt findings discussed below, the Court finds the evidence of noncompliance as to the sending of servicing letters does not support a finding of contempt by clear and convincing evidence.

The last two contempt categories-pertaining to the institution of servicing actions and the making of exceptions-are necessarily intertwined issues. Plaintiffs have presented evidence tending to show that in a large number of cases, Federal Defendants have accepted prepayment of noncompliant borrower files and closed the books on enforcement (Plaintiffs put the number at approximately 60 after Federal Defendants were warned not to do so in March 2002, see Plaintiffs' Reply, at 5). In some 23 instances, this was done without any investigation of the borrower file. (Roach Decl. at ¶ 17.) Federal Defendants themselves admit that prepayment non-enforcement has occurred in an unspecified number of cases. (White Decl., at ¶¶ 15–17.) They further admit that the National Office (the Administrator) has approved such action in a few cases. *Id.* (*See also* Ninth Quarterly Report, # QR9-00749.) They contest, nevertheless, that their conduct was not contemptuous because the borrowers were statutorily permitted to prepay the loans and because they did not utilize this strategy for the purpose of avoiding enforcement.

■ Federal Defendants' claims of innocence fall on deaf ears when they have previously been warned against utilizing prepayment and have subsequently allowed the practice to flourish. The federal statute governing these prepayments, 42 U.S.C. § 1472(c)(3)-(5), which is the official policy of the Federal Government, discourages prepayment because of its potential negative effects on the supply of section 514 housing. Federal Defendants characterize their enforcement of the limitations on prepayment as consistent with the statutory language—which discourages them except when either the housing is unneeded or the loan is no longer fulfilling the purpose of providing tenant housing. (Fed. Defs.' Combined Mem., at 29.) However, Federal Defendants do not claim that this condition was met as to all of the prepayments, nor do they claim that the proper regulatory approvals were made in all cases. (*See* White Decl. at ¶¶ 16–17.) Further, the discovery of April Roach that prepayment was allowed in many cases without documented investigation is damning to their position that they scrupulously monitored prepayment requests. (Roach Decl. at ¶ 23.)

As for Federal Defendants' argument that prepayment was mandatory under federal case law, this argument too fails decidedly. The cases cited by Federal Defendants, including *Franconia Assocs. v. United States*, 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) and *Parkridge Investors Ltd. Partnership v. Farmers Home Admin.*, 13 F.3d 1192 (8th Cir.1994), do not concern the section 514 loan program. They instead concerned the section 515 loan program. Those cases also do not concern prepayment in the context of borrowers who were noncompliant with mandatory regulatory requirements. Thus, the case law is not controlling nor is it persuasive. Whenever an agency crafts mandatory regulatory duties for itself, it would seem evident that the agency should utilize whatever opportunities are reasonably available to ensure compliance. The insistence upon regulatory compliance in advance of prepayment, in this light, seems an easy and ready instrument to assist the agency in obtaining compliance.

Furthermore, even were Federal Defendants correct in accepting prepayments, there is no reason for ignoring the Court's

injunction to continue efforts to collect the rebates. As Federal Defendants' own Administrative Notice (RD AN No. 3924 (1930–C)) shows, even after prepayment, they continue to possess the ability to sanction noncompliance. Though the only effective sanctions may be suspension and debarment from Department of Agriculture programs, these are not insignificant enforcement means, especially when they might have the added benefit of preventing bad actors from rejoining loan programs affecting farm laborers. As such, the Court finds that Federal Defendants' knowing abandonment of enforcement of prepaid noncompliant borrower accounts constitutes contempt.

Another policy decision made by Federal Defendants which works directly against the purposes of the 2000 injunctive orders is the allowance of widespread exceptions to enforcement of rebates pursuant to 7 C.F.R. § 1930.144 (as well as a separate Administrative Notice discussing the regulatory criteria-RD AN No. 3570 (1930–C)). Federal Defendants have admitted doing so in 36 cases (in a relatively short time period) and have an additional 24 cases pending (Pls.' Exs. R & S.). The Declaration of April Roach put the number even higher-at 77 cases in Arkansas alone. (Roach Decl. at ¶ 18.) The treatment of those cases (which concerns in part whether the unauthorized charges were "reasonable"-so as to warrant retroactive approval) is sufficient to prove by clear and convincing evidence that Federal Defendants have again adopted policies of non-enforcement of the mandatory regulatory duty to refund tenant rents and utility charges, which were not approved in advance by regulators. This is contemptuous and directly undermines the purpose and objective of the previous binding and final injunctive orders. This is not to say that Federal Defendants have no authority to grant exceptions in rare cases. Those cases must be rare though and directed at

objectives other than enforcement avoidance. Federal Defendants cannot once again dress their failed policies in the clothes of an exception authority and hope their true identity will remain secret. Pigs in tuxedos still look and smell like swine.

Finally, there is the subject of the failure to conduct servicing actions. In this respect, the evidence is striking. In certain states, servicing actions have been routinely performed (such as Hawaii which has serviced 100 percent of its noncompliant borrowers) while in other states (such as Arkansas) they have been rarely used (5.6 percent) despite widespread violations. Federal Defendants excuse these failures based on the seriousness of servicing actions and emphasize that servicing actions have the potential of alienating borrowers and, in the long-term, depleting the number of farmers offering tenant housing. Federal Defendants also argue that they cannot be subject to sanction since there was no explicit deadline imposed for the use of servicing actions to obtain compliance. These are very valid arguments, but they do not win the day because the record in this case evidences that Federal Defendants, through both the national office and their Arkansas state office, knowingly engaged in a policy of not subjecting noncompliant borrowers to servicing actions. The use of such a *de facto* policy in the operation of the national and Arkansas program constitutes contempt.

### 2. Sanctions

■ This brings the Court to the issue of what sanctions or remedies should be awarded as to the contempt. Civil contempt sanctions are by their nature both compensatory and coercive. *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 838, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). That is, they are directed at compensating the wronged par-

ty for the contempt violation and ensuring that the purpose of the decree is fulfilled. For this reason, the Supreme Court has recognized that in the context of contempt proceedings the federal courts have broad powers to order remedies to fulfill the purpose of their decrees. *See, e.g., McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193–94, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *In re Arthur Treacher's Franchise Litig.*, 689 F.2d 1150, 1158 (3rd Cir.1982); *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977).

■ Notwithstanding this discretion, this discretion is not lightly exercised when it comes to imposing monetary sanctions against governmental officials in their official capacities. There is substantial precedential authority holding that sovereign immunity prevents this practice. *See Coleman v. Espy*, 986 F.2d 1184, 1192 (8th Cir.1993); *United States v. Horn*, 29 F.3d 754, 763 (1st Cir.1994); *Barry v. Bowen*, 884 F.2d 442, 444 (9th Cir.1989). Even apart from this authority, though, this Court does not regard the instant case as an appropriate instance for the award of monetary sanctions. While Federal Defendants' conduct has been contemptuous and without excuse, they have almost made some positive efforts in collecting rebates which should be commended. At this juncture, the most pertinent issue is how best to expend Federal Defendants' limited resources to accomplish the purpose of the Court's decrees-the enforcement of the regulatory duties. This suit

comes at a time of frugal federal budgets and limited resources for federal officials. Doubtless the conservation of these resources will assist them in fulfilling their regulatory duties generally and more specifically the ones at issue in this suit.

Finally, if for no other reason, compensatory sanctions are inappropriate because competent proof of the amount of losses and attorney fees have not been submitted to the Court. *See O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir.1992) (holding that monetary sanction was not supportable as a compensatory civil contempt sanction because there was no proof of the amount of loss); *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir.1986) (reversing compensatory contempt sanctions in the absence of proof of loss); *In re Chase & Sanborn Corp.*, 872 F.2d 397, 401 (11th Cir.1989) (requiring compensatory contempt sanctions to be based on the amount of proven loss). Coercive monetary sanctions have also not been shown to be a proper or effective solution in the context of this case and the pertinent legal factors. *See Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 567 (5th Cir.1990). Accordingly, no monetary sanctions will be imposed.

■ This is not to say, though, that the District Court is without power to enforce its decrees. The District Court's authority clearly includes requiring additional affirmative conduct of the contemnor even if such conduct is not required by the underlying injunction. *In re Arthur Treacher's Franchise Litig.*, 689 F.2d at 1158; *N.L.R.B. v. J.P. Stevens & Co., Inc.*, 563 F.2d 8, 15 (2d Cir.1977).[3] Otherwise, Fed-

---

3. In opposition to the amendment, Federal Defendants have cited the rather ancient case of *L.E. Waterman Co. v. Standard Drug Co.*, 202 F. 167, 170 (6th Cir.1913) for the proposition that a decree cannot be modified based on an order to show cause. The Court doubts that this is still the law on this subject in the Sixth Circuit since *Waterman* long predates

the adoption of the Federal Rules of Civil Procedure and based its decision in part on the expiration of the previous term of court. (Since 1948, formal terms of court have been abolished by Congress. *See* 28 U.S.C. § 138.) Even if *Waterman* is still valid law, it is distinguishable since in the present instance the

eral Defendants would be encouraged to simply await the end of decrees. In this case, such additional affirmative conduct is justified on two bases: first, as a remedy for contempt; and second, pursuant to the Court's authority under Federal Rule of Civil Procedure 60(b)(5) to amend decrees in order to fulfill their underlying purposes. *Epic Metals*, 181 F.3d at 1283. Having determined that this is the appropriate response to the contempt in this case, the Court turns its attention to the more detailed question of how the previous injunction should be modified.

Plaintiffs have suggested some seven amendments, which are as follows: (1) requiring Federal Defendants to extend their Administrative Notice for a period of three years; (2) requiring mandatory deadlines for the processing of servicing actions; (3) prohibiting Federal Defendants from accepting prepayment of loans until all servicing efforts have been documented and exhausted; (4) prohibiting Federal Defendants from basing decisions regarding exception authority upon either the borrowers' initial understanding of the permissible charges or on the reasonableness of the charges; (5) prohibiting payments of rebates for unlocated tenant to Federal Defendants' Rural Housing Insurance Fund except when they have documented both that the original tenants cannot be located and that existing tenants cannot be credited; (6) requiring continuation of quarterly reporting during the extended Administrative Notice; and (7) requiring quarterly reporting to include supporting documentation regarding prepayments, exceptions and inability to locate affected tenants entitled to rebates. The Court will address these requests *seriatim.*

In addressing these requests, the Court attempts to balance two competing priorities-first, the need to fulfill the purposes of the judgment, *see Epic Metals,* 181 F.3d at 1283.; and second, the need of Federal Defendants to retain necessary discretion to carry out their duties, *see Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 525, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Both needs are important and will be respected.

 Regarding the extension of the Administrative Notice, it is obvious that an extension is required because the work of the judgment is now far from finished. The Court will therefore require the extension of the decree for a period of not less than one year nor more than three years-though the precise timing of the extension will be left to Federal Defendants in the exercise of their discretion. This relief is not unduly intrusive upon Federal Defendants since the Administrative Notice is their own creation and has already been voluntarily extended by them for the purpose of accomplishing enforcement.

Regarding the establishment of enforcement deadlines, this is a more delicate issue because the Administrative Notice establishes no such deadline and Federal Defendants have been resolute in opposing concrete deadlines. However, because the Court is providing discretion to Federal Defendants to establish a reasonable time period for enforcement, it is also reasonable to order them to complete all enforcement means as to noncompliant borrowers within the term of the extended Administrative Notice. The maximum term of three years is proper given that Federal Defendants stated in their briefing that they expected completion of servicing in March 2004. This flexible deadline is a

---

parties have been fully heard on the issue of whether the Judgment should be modified

under Rule 60.

minimal expectation given the modest number of borrower files involved and given that the Judgment was issued some seven years ago. To do otherwise would invite further delays perverse to both substantive justice and effective judicial administration.

Regarding the prohibition of prepayment until servicing is complete, this too is an important element of any program which is calculated to obtain rebates for tenants because borrowers at the time of prepayment have an obvious incentive to refund the unauthorized rental or utility charges in order to satisfy regulators and complete the prepayment process. Furthermore, a contrary policy would invite and has already caused widespread evasion. This prohibition will not unduly impose a burden on regulators or borrowers since regulators retain authority to expedite servicing actions in cases where prepayment is requested on an urgent basis (such as due to the death of a farmer or closure of a farm). Likewise, borrowers themselves can resolve the issue promptly by simply paying their long overdue rebates. This Order is necessary because the Court's previous Opinion on this subject has been ignored to the detriment of class members. This prohibition does not "change the rules" as to noncompliant borrowers-since the regulations have long promised them enforcement as to unauthorized rental and utility charges.

Regarding restrictions on enforcement exceptions, this too is an important element of any program which is calculated to obtain mandatory rebates for tenants for rental and utility charges which were not authorized at the time. A contrary policy would invite and has caused widespread evasion, particularly in the State of Arkansas. This prohibition will not impair the legitimate use of exceptions since regulators otherwise retain their discretion and authority in the exception arena. It will only limit the use of exceptions wherein regulators are acting to retroactively approve charges based on the reasonableness of the charges or the borrower's initial understanding. This limitation is consistent with the long-established law of this case. To do otherwise would be to openly endorse the view that Federal Defendants' regulatory duties to affected tenants are but an empty promise, one which can be ignored to pursue the expediencies of the moments.

Regarding the placing of restrictions on deposits into the Rural Housing Insurance Fund, the request made by Plaintiffs is not presently justified. This Court has seen no evidence that Federal Defendants have made payments to the Fund when affected tenants were available to credit. The allegation itself makes little sense-since both the borrowers and Federal Defendants know the identity of affected tenants and have vested interests in benefitting those tenants if they can be found. Furthermore, the modification of the Judgment to require Federal Defendants to rebate existing tenants (in place of affected tenants) instead of depositing the money in the Fund would constitute an improper usurpation of Federal Defendants' exercise of executive authority.

Regarding quarterly reporting, it is obvious that this must be extended for the time period of the extended Administrative Notice. Such quarterly reporting is required to ensure that the program is properly and transparently administrated. The quarterly reporting does not unduly infringe Federal Defendants' operation of the loan program since it is essentially a discovery device. Federal Defendants have themselves voluntarily extended quarterly reporting for 2004. As for requiring particular kinds of additional documentation, the Court prefers to leave this issue to the parties' discretion. The par-

ties' counsel in the past have cooperatively made decisions concerning the types and kinds of documentation necessary for review. There is no significant reason to upset this practice which, to date, has worked effectively in this case.

## CONCLUSION

For the reasons set forth above, this Court shall enter a Second Order Amending Judgment which provides that Federal Defendants' Motion to Dismiss be denied, Plaintiffs' contempt motion be granted, and the Judgment be amended as set forth above.

### SECOND ORDER AMENDING JUDGMENT

In accordance with the Opinion of this date;

**IT IS HEREBY ORDERED** that Federal Defendants' Motion to Dismiss (Dkt. No. 543) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt (Dkt. No. 522) is **GRANTED** and the following amendments to the Judgment and Permanent Injunction of February 9, 1996 are approved:

Federal Defendants, their successors, officers and agents, are **HEREBY ENJOINED** to:

1. Reissue their Administrate Notice ("AN"), upon expiration, for a period of not less than one year from this date, nor more than three years from this date;

2. Comply with "secondary request letters" (AN, § V.C), "last notice to avoid more serious servicing options" (AN, § V.D), and "processing problem case reports" (AN, § V.E) as to all noncompliant borrowers within the term of the reissued AN;

3. Refuse prepayment of noncompliant borrower loans until all servicing has been completed;

4. Avoid consideration of either "the reasonableness" of unauthorized charges or the borrower's "initial understanding" in the exercise of exception authority under 7 C.F.R. § 1930.144; and

5. Provide quarterly reports, under seal, to the Court and Plaintiffs, with supporting documentation for each borrower, until the expiration of the reissued AN.